## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

HOBART-MAYFIELD, INC. d/b/a
MAYFIELD ATHLETICS,

Case No.

v                                                    Hon.

NATIONAL OPERATING COMMITTEE ON
STANDARDS FOR ATHLETIC EQUIPMENT,            **DEMAND FOR**
KRANOS CORPORATION d/b/a SCHUTT              **JURY TRIAL**
SPORTS, RIDDELL, INC., XENITH, LLC,
GREGG HARTLEY, in his capacity as Vice
President of the National Operating Committee on
Standards for Athletic Equipment, MICHAEL OLIVER,
in his Capacity as Executive Director/Legal Counsel of the National
Operating Committee on Standards for Athletic
Equipment, VINCENT LONG, in his capacity as
Engineering Manager of Schutt Sports, and KYLE
LAMSON, in his capacity as Director of New
Product Innovation of Xenith, LLC,

        Defendants.

JAMES F. HEWSON (P27127)
DIANE L. HEWSON (P44628)
LYNN B. SHOLANDER (P78839)
Hewson & Van Hellemont, P.C.
Attorneys for Mayfield Athletics
25900 Greenfield Road
Suite 650
Oak Park, MI 48237
(248) 968-5200/(248) 968-5270 fax

## COMPLAINT

PLAINTIFF HOBART-MAYFIELD, INC. d/b/a MAYFIELD ATHLETICS,

by and through its attorneys, HEWSON & VAN HELLEMONT, P.C., hereby submits the following Complaint against the NATIONAL OPERATING COMMITTEE ON STANDARDS FOR ATHLETIC EQUIPMENT; KRANOS CORPORATION d/b/a SCHUTT SPORTS; RIDDELL, INC.; XENITH, LLC; GREGG HARTLEY, in his capacity as Vice President of the National Operating Committee on Standards for Athletic Equipment; MICHAEL OLIVER, in his Capacity as Executive Director/Legal Counsel of the National Operating Committee on Standards for Athletic Equipment; VINCENT LONG, in his capacity as Engineering Manager of Kranos Corporation d/b/a Schutt Sports; and KYLE LAMSON, in his capacity as Director of New Product Innovation of Xenith, LLC.

## I.    INTRODUCTION AND OVERVIEW

1.    In recent years, Plaintiff Hobart-Mayfield, Inc., d/b/a Mayfield Athletics (hereinafter referred to as "Mayfield Athletics") has attempted to widely market, distribute, and sell the S.A.F.E.Clip,[1] an aftermarket, add-on product for football helmets that has been proven to reduce g-force impact by as much as 35% per hit.

2.    During this period, the nation's leading helmet manufacturers and the National Operating Committee on Standards for Athletic Equipment (hereinafter referred to as "NOCSAE") have made overt and veiled efforts to

---

[1] S.A.F.E. is an acronym for "shock absorbing football equipment."

interfere with or otherwise impede Mayfield Athletics' attempts to market, sell, and distribute its product, which has the potential to reduce the g-force impacts experienced by millions of football players throughout the United States.

3.      In recent months, Mayfield Athletics has been informed by other manufacturers of aftermarket or add-on products for football helmets that its experiences are not isolated.  To the contrary, the facts and circumstances reveal a concerted effort by the nation's leading helmet manufacturers and NOCSAE to exclude aftermarket or add-on products from the national market for football safety equipment and accessories.

4.      As set forth below, Mayfield Athletics has been significantly harmed by Defendants' efforts to exclude aftermarket or add-on products from the market. More importantly, however, American consumers have been significantly harmed by Defendants' anticompetitive conduct and interference, in that football players, football teams, and related consumers have been deterred or prevented from purchasing products that have the potential of dramatically reducing the g-force impacts sustained by players while participating in the sport.

5.      Mayfield Athletics has attempted to educate and work with the helmet manufacturers and NOCSAE, hoping that they would terminate their unlawful and harmful representations and conduct without judicial intervention.  None of the Defendants have altered their positions or conduct in response to Mayfield

Athletics' efforts.

6.     Accordingly, Mayfield Athletics brings this lawsuit to (1) stop the unlawful representations and conduct of the nation's leading helmet manufacturers and NOCSAE, and thereby (2) ensure that the S.A.F.E.Clip and other aftermarket or add-on products with the potential to improve football players' well-being are widely available for purchase and use by football players and teams throughout the country.

## II.     THE PARTIES

7.     Plaintiff Hobart-Mayfield, Inc., d/b/a Mayfield Athletics, is incorporated and headquartered in Michigan.

8.     Defendant NOCSAE, a self-appointed nonprofit corporation that develops standards for athletic equipment, is incorporated in Missouri, with its principal place of business in Overland Park, Kansas.

9.     Mayfield Athletics is informed and believes, and thereon alleges, that at all times herein mentioned Defendants Gregg Hartley and Michael Oliver were agents of NOCSAE and, in doing the things alleged in this complaint, were acting in the scope of such agency and with the permission and consent of NOCSAE.

10.     Mayfield Athletics is informed and believes, and thereon alleges, that currently unnamed Defendants DOE 1 through DOE 25 were agents of NOCSAE at all times herein mentioned and, in doing the things alleged in this Complaint,

were acting in the scope of such agency and with the permission and consent of NOCSAE.

11.     Defendant Kranos Corporation d/b/a Schutt Sports, a corporation that manufactures football helmets (among other things), is incorporated in Delaware, with its principal place of business in Illinois.  In the interest of clarity and brevity, Kranos Corporation will be referred to as "Schutt Sports" in this complaint.

12.     Mayfield Athletics is informed and believes, and thereon alleges, that at all times herein mentioned Defendant Vincent Long was an agent of Schutt Sports and, in doing the things alleged in this Complaint, was acting in the scope of such agency and with the permission and consent of Schutt Sports.

13.     Mayfield Athletics is informed and believes, and thereon alleges, that currently unnamed Defendants DOE 26 through DOE 50 were agents of Schutt Sports at all times herein mentioned and, in doing the things alleged in this Complaint, were acting in the scope of such agency and with the permission and consent of Schutt Sports.

14.     Defendant Riddell, Inc., a corporation that manufactures football helmets (among other things), is incorporated and headquartered in Illinois. In the interest of clarity and brevity, Riddell, Inc., will be referred to as "Riddell" in this complaint.

15.     Mayfield Athletics is informed and believes, and thereon alleges, that

at all times herein mentioned currently unnamed Defendants DOE 51 through DOE 75 were agents of Riddell and, in doing the things alleged in this Complaint, were acting in the scope of such agency and with the permission and consent of Riddell.

16.     Defendant Xenith, LLC, a limited liability company that manufactures football helmets (among other things), is registered in Delaware and headquartered in Michigan. In the interest of clarity and brevity, Xenith, LLC, will be referred to as "Xenith" in this complaint.

17.     Mayfield Athletics is informed and believes, and thereon alleges, that Defendant Kyle Lamson was an agent of Xenith at all times herein mentioned and, in doing the things alleged in this Complaint, was acting in the scope of such agency and with the permission and consent of Xenith.

18.     Mayfield Athletics is informed and believes, and thereon alleges, that currently unnamed Defendants DOE 76 through DOE 100 were agents of Xenith at all times herein mentioned and, in doing the things alleged in this Complaint, were acting in the scope of such agency and with the permission and consent of Xenith.

19.     Upon information and belief, Riddell, Schutt Sports, and Xenith together enjoy more than 90% of the national football helmet market.

## III.    JURISDICTION AND VENUE

20.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337 because Mayfield Athletics' claims arise, in

part, under the Sherman Antitrust Act ("the Sherman Act"), 15 U.S.C. § 1 *et seq*.

21.     This Court also has original subject matter jurisdiction pursuant to 15 U.S.C. §§ 4, 15, and 25, and 28 U.S.C. §§ 1331 and 1337(a), because this Complaint is brought, in part, under the Clayton Antitrust Act to prevent and restrain Defendants' violations of the federal antitrust laws.

22.     This Court has supplemental subject matter jurisdiction over the subject matter of the claims brought under the laws of the State of Michigan pursuant to 28 U.S.C. § 1367 because those claims are so closely related to Mayfield Athletics' federal antitrust claims that they constitute part of the same case or controversy under Article III of the United States Constitution.

23.     This Court has personal jurisdiction over all of the defendants named in this complaint by operation of the federal antitrust laws and general federal law governing personal jurisdiction.

24.     Venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)(2) because, *inter alia*, a substantial part of the events, acts, or omissions giving rise to the claims alleged in this complaint occurred within, or were directed at, this judicial district.

## IV.    EFFECT ON INTERSTATE COMMERCE

25.     As alleged below, Defendants have engaged, and continue to engage, in violations of antitrust and tort law that have been within the flow of, and have

substantially affected, interstate trade and commerce.

26.     The conduct, statements, and representations made by NOCSAE, Riddell, Schutt Sports, and Xenith, through their agents, employees, and/or representatives, have been undertaken as part of a nationwide strategy directed by, and for the benefit of, each of the defendants. If not enjoined, the practices of NOCSAE, Riddell, Schutt Sports, and Xenith will impede the flow of interstate commerce by precluding the sale of most, if not all, aftermarket and/or add-on products intended for use on football helmets.

27.     The statements, conduct, and practices of NOCSAE, Riddell, Schutt Sports, and Xenith have affected the national market for football safety equipment and have specifically and concretely damaged Mayfield Athletics by rendering it largely impossible for Mayfield Athletics to sell the S.A.F.E.Clip to football players at all levels of play in the United States.

28.     The practices of NOCSAE, Riddell, Schutt Sports, and Xenith have also specifically and concretely damaged other aftermarket or add-on product manufacturers who are similarly situated to Mayfield Athletics.

V.     COMMON FACTUAL ALLEGATIONS

### Mayfield Athletics' S.A.F.E.Clip

29.     Mayfield Athletics was originally established in 2014 to conceptualize and design a unique football helmet shock absorber (later named the

"S.A.F.E.Clip").

30.     The S.A.F.E.Clip is installed on football helmets to attach the facemask to the helmet.  It can be retrofitted to most existing helmets and facemasks.

31.     Unlike typical facemask clips—which are static and do not absorb force—the S.A.F.E.Clip contains a Sorbothane insert, which causes the S.A.F.E.Clip to absorb and reduce the impact forces to the head each time a football player is hit.

32.     The S.A.F.E.Clip received fully patented status in 2017 (P#9750298B2).

33.     Mayfield Athletics has a second patent application related to the S.A.F.E.Clip that is currently pending.

34.     Between 2016 and 2018, several generations of the S.A.F.E.Clip were extensively tested and refined.

35.     Each round of testing was performed at an independent third-party laboratory adhering to NOCSAE standards for new football helmets.

36.     The most recent testing revealed that use of the S.A.F.E.Clip resulted in force reductions as high as 35% per hit.

37.     Mayfield Athletics has attempted to widely market, distribute, and sell the S.A.F.E.Clip to individual consumers, sports teams, and retailers, among others.

38.     Mayfield Athletics also has attempted to establish business relationships with Schutt Sports, Riddell, and Xenith, with the hope that the nation's

leading helmet manufacturers will (1) utilize the S.A.F.E.Clip as their preferred facemask attachment device, (2) offer the S.A.F.E.Clip as an add-on product for purchase, and/or (3) permit the use of the S.A.F.E.Clip as an approved product for reconditioning, thereby increasing the efficacy and utility of the football helmets sold and used throughout the United States.

### Organization and Operation of the National Operating Committee on Standards for Athletic Equipment and the Safety Equipment Institute

39.     NOCSAE holds itself out as an independent, nonprofit body that "develops voluntary performance and test standards for athletic equipment that are available for adoption by any athletic regulatory body."  (NOCSAE FAQs, Exhibit A.)

40.     The Safety Equipment Institute (SEI) manages the certification of athletic equipment to NOCSAE standards.

41.     On its website, SEI holds itself out as "a private, nonprofit organization established in 1981 to administer the first non-governmental, third-party certification program to test for public safety, and certify a broad range of safety equipment products." (SEI Company Overview, Exhibit B.)

42.     The majority of football regulatory bodies in the United States only permit football players to participate in the sport if they are using football helmets and facemasks that meet NOCSAE standards.

a.  Upon information and belief, the National Federation of High School

Football Rules Book requires that all players wear "[a] helmet and face mask which met the NOCSAE standard at the time of manufacture." The Rules Book further provides, "All players shall wear helmets that carry a warning label regarding the risk of injury and a manufacturer's or reconditioner's certification indicating satisfaction of NOCSAE standards. All such reconditioned helmets shall show recertification to indicate satisfaction with the NOCSAE standard."

b. Upon information and belief, the Football Rules Book promulgated by the National Collegiate Athletic Association ("NCAA") requires all players to use football helmets that meet NOCSAE standards.

c. Upon information and belief, the National Football League ("NFL") requires players in the league to wear football helmets that meet NOCSAE standards.

d. Upon information and belief, USA Football requires all players to wear helmets that meet NOCSAE standards.

e. Upon information and belief, the International Federation of American Football requires all players to wear helmets that meet NOCSAE standards.

f. Upon information and belief, youth football leagues frequently incorporate by reference the National Federation of High School

Football Rules Book and thereby require that all football helmets used by players bear the requisite certification that the helmets satisfy NOCSAE standards.

g.  Upon information and belief, many youth football leagues otherwise require that all football helmets used by players bear the requisite certification of satisfying NOCSAE standards.

43.   Other entities—such as the United States Center for Disease Control and Prevention—expressly recommend that the public rely on NOCSAE standards and a manufacturer's certification that its product meets NOCSAE standards in selecting and purchasing a football helmet.

44.   Football helmet manufacturers routinely invoke or rely on their compliance with NOCSAE standards in defending against lawsuits brought by injured players.

45.   In light of the foregoing, it is clear that NOCSAE possesses significant power and authority in the realm of American football, and that standards and representations made by NOCSAE directly influence and significantly affect the entirety of the football equipment industry.

46.   Additionally, as a result of NOCSAE's self-appointed power and influence, pieces of equipment that do not meet NOCSAE standards, and pieces of equipment as to which no NOCSAE standard exists, are largely excluded from the

national market for football safety equipment and accessories.

47.    NOCSAE and SEI are both funded primarily through revenue generated from equipment manufacturers in exchange for product certification and licensure, including the use of trademarked NOCSAE and SEI logos and phrases on qualifying products.

48.    Under this relationship, NOCSAE enters into licensing agreements with the manufacturers of sports equipment, which incorporate a "License Fee Schedule" under which equipment manufacturers are charged, and NOCSAE receives, a fee for each unit of product sold that includes the trademarked NOCSAE logo(s) or phrase(s) on (1) the product itself, (2) its packaging, (3) its instructions, (4) its product documentation, or (5) its marketing materials.

49.    Under this arrangement, NOCSAE's financial viability is directly dependent on its relationship with, and the success of, sports equipment manufacturers, including Riddell, Schutt Sports, and Xenith.

50.    Upon information and belief, employees, agents, and/or representatives of the leading helmet manufacturers (including Riddell, Schutt Sports, and/or Xenith), or individuals closely related to those companies, are current or former members of the NOCSAE Standards Committee and/or exhibit significant influence over the NOCSAE Standards Committee.

51.    Upon information and belief, employees, agents, and/or representatives

of the leading helmet manufacturers (including Riddell, Schutt Sports, and/or Xenith), or individuals closely related to those companies, are current or former members of the NOCSAE board of directors and/or exhibit significant influence over the NOCSAE board of directors.

### NOCSAE's Unlawful Conduct, Statements, and Representations

52.     One of the testing standards established by NOCSAE is a "Severity Index" for evaluating football helmets.

53.     NOCSAE's use of and statements regarding the Severity Index suggest that NOCSAE is setting reliable standards for the manufacture and use of football helmets.

54.     SEI allegedly conducts testing to certify that football helmets are within the permissible range of the Severity Index established by NOCSAE.

55.     NOCSAE's own publications concerning the Severity Index confirm that the standard is illusory and, in fact, provides no meaningful information regarding the safety of a particular football helmet model, especially in relation to preventing injuries (NOCSAE Severity Index FAQs, Exhibit C; Football Helmet Standards Overview, Exhibit D).

56.     For example, NOCSAE's "Severity Index FAQs" states:

> The SI number is a cutoff point for head injury probability overall. ***There is no measurable difference in safety of helmets with scores below the 1200 SI threshold. For example, a helmet scoring 400 SI isn't more likely to***

***reduce injury than one scoring 800 SI.*** Once the SI value gets below approximately 800 to 900, the change to the risk of injury is essentially immeasurable. Because of the very strict and demanding quality control and quality assurance requirements specified in the NOCSAE standard, helmets certified to the NOCSAE standard will test substantially below 1200 SI, typically in the 400 to 600 SI range.

\* \* \*

**<u>SI figures can be misleading when it comes to helmet performance.</u>** . . . *A single football helmet model has potentially 29 different and separate SI values generated by a single certification test, and the numbers for that helmet model will vary from other helmets of the same model, and even from the same production line.*

\* \* \*

No football helmet can prevent concussions. Because the SI units are not concussion specific, it is impossible to compare the scores of one helmet with another and determine which helmet provides better protection. ***Variables such as the helmet, the condition and integrity of the padding and energy attenuation systems inside the helmet, the current health and concussion history of the player wearing the helmet, and the athlete's style of play with regard to the use of the head are far more related to the likelihood of concussion than are differences in SI values from one helmet to the next.*** [Exhibit C (emphasis added).]

57. NOCSAE's website also states the following regarding the wide

variability of the Severity Index:

There is no single SI number for any single helmet or model. A helmet model in any given size alone may have over 10,000 different SI scores from all samples tested, depending on the number of helmets produced.

> *NOCSAE does not allow SI-related safety claims about one model or brand over another because such claims would be scientifically unfounded and misleading to consumers*.  [NOCSAE FAQs, Exhibit A (emphasis added).]

58.     NOCSAE has promulgated Standard ND087 17m17c, which describes the test and performance requirements that are required for football facemasks to qualify for NOCSAE certification.

59.     However, NOCSAE has not created standards for testing the safety and efficacy of the S.A.F.E.Clip or any other facemask attachment device.

60.     On July 16, 2013, NOCSAE issued a press release entitled "NOCSAE statement on third party helmet add-on products and certification."  (Exhibit E.) Among other things, the press release definitively stated that the addition of after-market products to a helmet "voids the certification of compliance with the NOCSAE standard":

> There are many new products on the market that are intended to be added to helmets, in particular football helmets, which products claim to reduce concussions and make helmets safer and more protective. Whether these are additional liners or padding on the inside, or bumpers, pads, coverings or electronic devices that attach to the outside of the helmet, these products were not included in the certification testing and quality control programs that are required for all helmets that are certified to the NOCSAE standards. To address this situation, and to protect the integrity of the NOCSAE standards, the NOCSAE board of directors has adopted the following position:
>
> > "NOCSAE helmet standards are specific to models which are identical in all aspects, except as to size. The testing required to support the certification is also specific to the model being certified. NOCSAE standards require that

any change in configuration, padding, shell geometry, or protective system requires a new model designation with separate certification testing. ***The addition of after-market items by anyone that changes or alters the protective system by adding or deleting protective padding to the inside or outside of the helmet, or which changes or alters the geometry of the shell or adds mass to the helmet, whether temporary or permanent, <u>voids the certification of compliance with the NOCSAE standard</u>***." [Emphasis added.]

61.    Approximately three weeks later, NOCSAE issued a second press release entitled "Certification to NOCSAE Standards and Add-On Helmet Products" (Exhibit F), which clarified its position as to whether the use of an aftermarket or add-on product may void a helmet's certification of compliance with NOCSAE standards.  In relevant part, the press release stated:

- NOCSAE itself does not certify any product, it does not "approve" or "disapprove" of any product, and has no authority to grant exemptions or waivers to the requirements imposed by the standards it writes.

- The addition of an item(s) to a helmet previously certified without those item(s) creates a new untested model. Whether the add-on product changes the performance or not, the helmet model with the add-on product is no longer "identical in every aspect" to the one originally certified by the manufacturer.

- When this happens, the manufacturer which made the original certification has the right, under the NOCSAE standards, to declare its certification void. It also can decide to engage in additional certification testing of the new model and certify the new model with the add-on product, but it is not required to do so.

- ***Companies which make add-on products for football helmets have the right to make their own certification of compliance with the NOCSAE standards on a helmet model, but when that is done, the certification and responsibility for the helmet/third-party product combination would become theirs, (not the helmet manufacturer). That certification would be subject to the same obligations applicable to the original helmet manufacturer regarding certification testing, quality control and quality assurance and licensure with NOCSAE.***

- Products such as skull caps, headbands, mouth guards, ear inserts or other items that are not attached or incorporated in some way into the helmet are not the types of products that create a new model as defined in the NOCSAE standards and are not items which change the model definition." [Emphasis added.]

62.    In reliance on NOCSAE's public representations, Mayfield Athletics extensively tested the S.A.F.E.Clip to independently certify that use of the S.A.F.E.Clip complied with NOCSAE standards.

63.    Prior to 2018, NOCSAE was aware of Mayfield Athletics' development and marketing of the S.A.F.E.Clip as an aftermarket add-on product for football helmets via communications between Mayfield Athletics and Defendant Michael Oliver.  Upon information and belief, NOCSAE may have been aware of Mayfield Athletics' development and marketing of the S.A.F.E.Clip through other avenues as well.

64.    On May 8, 2018—after Mayfield Athletics had subjected the S.A.F.E.Clip to extensive testing and had begun marketing the S.A.F.E.Clip to

individual consumers, football teams, and national helmet manufacturers—NOCSAE published a press release entitled "Certification to NOCSAE Standards and Add-On Helmet Products" (Exhibit G), which revised its previous position on add-on helmet products, stating as follows:

- NOCSAE, itself, does not certify any product, it does not "approve" or "disapprove" of any product, and has no authority to grant exemptions or waivers to the requirements imposed by the standards it writes.

- The addition of an item(s) to a helmet previously certified without the item(s) creates a new untested model. Whether the add-on product improves the performance or not, the helmet model with the add-on product is no longer "identical in every aspect" to the one originally certified by the manufacturer.

- ***When this happens, the helmet manufacturer has the right, under the NOCSAE standards, to declare its certification void. It may elect to allow the certification to remain unaffected, or it may also decide to engage in additional certification testing of the new model and certify the new model with the add-on product, but it is not required to do so.***

- Products such as skull caps, headbands, mouth guards, ear inserts or other items that are not attached or incorporated in some way into the helmet are not the types of products that create a new model as defined in the NOCSAE standards, and are not items which change the model definition.  [Emphasis added.]

65.    In sum, the May 2018 press release (1) omitted the provision that previously permitted add-on product manufacturers to make their own certification of compliance with NOCSAE standards and (2) expressly clarified that helmet

manufacturers may, at their sole discretion, void their certifications, allow their certifications to remain unaffected, or engage in additional certification testing whenever add-on products are used with their products.

66.     NOCSAE's website currently includes the following statement, which expressly discourages the use of helmet add-on products:

> ***Helmets should not be altered. Add-on accessories can change a helmet and interfere with performance in ways unintended by the manufacturer.*** The helmet's original padding, fit and components were tested for compliance with the NOCSAE standards, and altering these components may result in a helmet that does not perform as designed, and ***could increase the risk of injury. A manufacturer can declare a product's certification to the NOCSAE standard void if its product is altered.*** [NOCSAE FAQs, Exhibit A (emphasis added).]

67.     NOCSAE's website further states the following regarding whether "a helmet which bears the NOCSAE seal [can] be altered or repaired without legal ramifications," which further discourages the use of helmet add-on products:

> ***A helmet should not be altered.*** ***Any change or modification in the configuration of the shell or liner materials from manufacturing specifications could substantially alter the performance of the helmet as a unit, causing a change in helmet performance, and possibly exposing the individual responsible to liability.*** Individual helmet models are certified in the condition and configuration in which they were manufactured, and any alteration, modification, or change from the manufacturing specifications could affect the model's performance on the NOCSAE certification test. By following proper installation procedures and using replacement parts which meet or exceed original manufacturer specifications, skilled repair of a football helmet should not affect the integrity of the energy attenuation system. It is suggested that the manufacturer be consulted before any materials are applied to the helmet such as, but not limited to, paint, wax, thinners, solvents,

vinyl tape designs, cleaning agents, etc.  [NOCSAE FAQs, Exhibit A (emphasis added).]

68.    Paradoxically, NOCSAE's website also states that brand-name replacement parts are *not* required when helmets are reconditioned:

> The NOCSAE standard is not brand specific. Neither the test nor the performance standard call for any specific brands, materials or designs. The standard speaks only to the performance of the helmet when new, and recertification. ***The standard does not require the use of original equipment parts, but does require that "all components must function as originally certified" which requires OEM equivalence***.  [NOCSAE FAQs, Exhibit A (emphasis added).]

69.    NOCSAE's public statements have effectively abrogated any foundation for concluding that a helmet's purported certification to NOCSAE standards has any meaning or comports with any identifiable standards.

70.    Despite continuing to hold itself out as an independent entity that creates objective, science-based standards for equipment safety, NOCSAE has ceded this duty to the same manufacturers that market their products as being certified to NOCSAE standards.

71.    NOCSAE's statements and positions have empowered helmet manufacturers to operate as third-party gatekeepers for aftermarket or add-on products in the national market for football safety equipment and accessories.

72.    In addition, NOCSAE has directly discouraged the use of helmet add-on products, while also claiming that "it does not 'approve' or 'disapprove' of any product[.]"

73.    In August 2018, NOCSAE Vice President Gregg Hartley made several statements regarding Mayfield Athletics' ability to sell and market the S.A.F.E.Clip. He confirmed that NOCSAE has not established a standard for mounting hardware, including facemask attachment hardware, on a football helmet.  However, after acknowledging that there is "no standard" for mounting hardware, Mr. Hartley stated that if the S.A.F.E.Clip were offered for sale separately from a "faceguard system," NOCSAE would, "if asked," "have to declare it not certified."  Mr. Hartley also confirmed that the maker of a facemask or helmet retains the option of voiding a certification that its product meets NOCSAE standards in the event that after-market hardware (like the S.A.F.E.Clip) is used with the helmet or facemask.

74.    In sum, NOCSAE has publicly and privately taken the position that a helmet manufacturer is in complete control of whether an aftermarket or add-on product can be added to a helmet and whether use of an aftermarket or add-on product will affect a helmet's certification to NOCSAE standards.

75.    Despite taking this position, NOCSAE continues to publicly and privately maintain that facemask attachment hardware is not certified and cannot be certified given the lack of NOCSAE standards for such hardware.

76.    On October 2, 2018, Mayfield Athletics' counsel sent written correspondence to NOCSAE requesting discussion and clarification regarding the inconsistent and confusing public representations made by NOCSAE and the leading

helmet manufacturers (Exhibit H).

77.    NOCSAE never responded to Mayfield Athletics' October 2018 letter.

78.    Through its representations, and illusory authority and influence, NOCSAE has supported large-scale helmet manufacturers and denied access to the marketplace for aftermarket or add-on products that improve the efficacy and performance of a football helmet.

79.    NOCSAE has established an illusory structure under which it holds itself out as an "independent" entity "with the sole mission to enhance athletic safety through scientific research and the creation of performance standards for athletic equipment."    However, in reality, manufacturers of athletic equipment pay thousands of dollars to NOCSAE and SEI in order to obtain certification that their products meet NOCSAE's standards.  In reality, however, the "certification" has no practical meaning or significance and is easily manipulated by the manufacturer after the certification is obtained.

80.    The system created and maintained by NOCSAE creates a closed group of football helmet manufacturers (including Riddell, Schutt Sports, and Xenith) that pay vast sums of money to NOSCAE and SEI in order obtain certification that their products meet NOCSAE standards.

81.    The helmet manufacturers then leverage that "certification" through their licensing agreements with NOCSAE, which permit them to utilize and rely on

NOCSAE's trademarked logos and phrases and thereby establish and maintain a monopoly on the market for football safety equipment and accessories, to the exclusion of manufacturers of aftermarket or add-on products (given that the majority of football regulatory bodies only permit the use of helmets that meet NOCSAE standards).

### The Leading Helmet Manufacturers' Unlawful Conduct, Statements, and Representations in Relation to the S.A.F.E.Clip and Other Aftermarket Products

82.   Mayfield Athletics has encountered extensive interference from NOCSAE and other entities, including leading football helmet manufacturers (i.e., Riddell, Schutt Sports, and Xenith), during its attempts to market, distribute, and sell the S.A.F.E.Clip, despite the demonstrated efficacy of the S.A.F.E.Clip.

83.   Schutt Sports, Riddell, and Xenith have repeatedly and publicly warned customers—through websites, publications, and direct statements made by individual sales personnel and management members—that use of the S.A.F.E.Clip with their helmets would be illegal and/or would violate their respective helmet warranties.   These representations are contrary to federal law.   See 15 U.S.C. 2302(c); 15 U.S.C. 2310; 16 C.FR. 700.10.

84.   Schutt Sports, Riddell, and Xenith have repeatedly and publicly warned customers—through websites, publications, and direct statements made by individual sales personnel and management members—that use of the S.A.F.E.Clip

with their helmets would void the helmets' certification to NOCSAE standards.

85.   On August 17, 2018, Riddell issued a "Response to Address Aftermarket Accessories and NOCSAE Certification," stating as follows:

> Football helmets and face masks worn by professional, collegiate, high school and most youth football players are required to meet National Operating Committee on Standards for Athletic Equipment (NOCSAE) performance standards. NOCSAE certification is conducted by Safety Equipment Institute (SEI), an ISO 17065 conformity assessment organization. The certification process involves rigorous internal product testing, independent laboratory testing and a sound quality assurance program. Each helmet and face mask model is certified by SEI to meet NOCSAE performance standards. ***The certification is void if the helmet or face mask is modified in any way. Riddell recommends against the use** of any third party aftermarket accessories that alter the fit, form or function of the helmet or face mask **as such modifications void the NOCSAE certification** and render the helmet or face mask **illegal** for most organized play.* [Exhibit I (emphasis added).]

86.   Riddell's helmet warranty is published on its website.  It states:

> The warranty on helmet shells is five (5) years for polycarbonate varsity helmets and three (3) years for ABS youth helmets from the original date of purchase, provided there has been normal use and proper maintenance. It is recommended that your helmet be reconditioned every year by a Riddell Factory Authorized Reconditioner. Proper maintenance requires reconditioning of your helmet at least every two (2) years by a NOCSAE Licensed Reconditioner using only new factory replacement liners in the reconditioning process. ***Evidence of any of the following conditions will operate to *void* this warranty***: 1) Failure to have the helmet reconditioned at least every two (2) years by a NOCSAE Licensed Reconditioner. 2) Installation of used parts instead of new parts whenever a liner replacement is necessary. 3) Where shells have been damaged by a chemical reaction from the use of incompatible materials such as: a. Attachment of a

guard, face mask or component of another manufacturer or mismatched material. b. Use of cleaners, waxes or paints of another manufacturer or failure to follow recommended cleaning and painting instructions. 4) Excessive drilling of holes or drilling of any new holes less than ½" from each other or the edge of the shell. 5) Abusive treatments or any use other than the playing of American football. 6) Removal of, or obliteration of, the Warranty label, date code or warning labels. Varsity and youth football helmet component parts are warranted to be free of defects in material and workmanship for a period of one (1) year provided there has been normal use and proper maintenance. This warranty is in lieu of all other warranties, expressed or implied, whether Statutory or otherwise, including any implied warranties of merchantability or fitness for any particular purpose. Manufacturer shall not be liable for any consequential damages resulting from the use of its products. Products covered by these warranties should be returned to the manufacturer, along with evidence of the date of purchase.  [Exhibit J (emphasis added).]

87.    Xenith's helmet warranty is published on its website. It states:

Xenith warrants helmet shells to be free from defects in material and workmanship for a period of five (5) years from date of shipment for all varsity and youth polycarbonate shells and for a period of three (3) years from date of shipment for youth abs shells. The assembled liner (including the interior liner, all shock absorbers, jaw plates and hook/loop attachments) are warranted for a period of two (2) years from the date of shipment; comfort pads are warranted for one (1) year only. If, during the warranty period, the helmet shell and/or liner fail in the course of normal use due to material defect, dealer, (not other parties having physical possession of the equipment) shall notify Xenith and request a return authorization. The defective unit shall then be returned to Xenith's repair center by dealer, freight prepaid, with a failure report along with the place and dates of reconditioning. It will either be repaired or replaced, at Xenith's option, and returned to dealer or its designate, freight prepaid. Duties, tariffs and transportation insurance associated with such return shall be dealer's responsibility. ***The foregoing warranty shall not apply***

*to defects resulting from*: 1) improper or inadequate maintenance by dealer or its customers; or, 2) *unauthorized modification, misuse or accidents.*

*Dealer may replace worn components (facemasks, facemask clips, snap buckles, chin straps, chin cups) with only Xenith approved replacement parts.* Dealer shall inform its customers that Xenith recommends: 1) annual reconditioning of each helmet by a Xenith authorized reconditioner and that failure to do so may adversely affect the performance of the helmet; 2) that helmets be retired from service not later than ten (10) years after initial use; and 3) that shock absorbers should never be swapped from its original location to another within the interior liner (see shock absorber alteration warning below.) *This warranty shall be void as a result of any of the following*: 1) repairs or alterations made to a helmet which modify or alter the helmet including the removal of any warning labels. 2) *use of helmet replacement parts other than Xenith approved replacement parts*. 3) *the application of any unapproved device or material to the helmet*. 4) failure to use a Xenith authorized helmet reconditioner. (a list of authorized reconditioners as of the effective date is attached to this agreement; an updated list may be obtained from Xenith's customer service department or at www.Xenith.com.) 5) failure to recondition the helmet at least once every two (2) years.

*Warranty exclusions: except as noted, the following components are not warranted*: chin pieces, low and high chin straps, snap buckles, *facemasks, facemask clips*, and fastening hardware including but not limited to t-nuts, screws and snaps. Notwithstanding the foregoing, Xenith warrants the hybrid strap and chin cup assemblies for one (1) year.

Shock absorber alteration warning: Xenith uses several types of shock absorbers in every football helmet. Each type of shock absorber is designed differently and strategically placed in the interior liner to achieve the desired performance. Shock absorbers may not be interchanged or swapped from one location to another. Altering the shock absorber configuration could

adversely affect the performance of the helmet. Xenith disclaims any responsibility or liability resulting from unauthorized alteration of the shock absorber configuration. Dealer may only replace worn or damaged jaw and crown shock absorbers on football helmets with identical Xenith replacement parts. [Exhibit K (emphasis added).]

88.   Schutt Sports publishes warranty information on its website. It states,

in relevant part:

Football Helmet Warranty For complete details on the helmet warranty, warnings and helmet care be sure to review the football helmet fitting guide that can be found on this website. Important — Warranty -— Performance You may replace or change any part or component of the Schutt Helmet System as long as you follow the manufacturer's guidelines. ***However, alterations, additions or any component deletions or removals you make to the helmet may void this warranty*** and could adversely affect the protective capabilities of the helmet. Should there ever be any question regarding the warranty, evaluation or function of a helmet and/or the component parts, please contact Schutt Sports for a free helmet inspection. . . .  Use of Third Party and After-Market Products on Schutt Products All Schutt helmets and faceguards are manufactured and certified to meet the current NOCSAE performance standards. ***Alterations, additions or any component deletions or removals made to the helmet or faceguard that do not follow the manufacturer's guidelines may void any applicable warranty to the product and will void the NOCSAE certification of the helmet and faceguard. Schutt Sports recommends against the use of any third party, aftermarket product or accessory that alters the fit, form or function of the helmet or faceguard. Third party, aftermarket products that are used on a Schutt helmet and do not follow manufacturer's guidelines will void the NOCSAE certification and make the helmet or face mask <u>illegal</u> to use in most organized football leagues, games or other activities.*** [Exhibit L (emphasis added).]

89.   The helmet manufacturers' representations that the use of aftermarket

products would void the applicable warranties and/or render the helmets illegal to use are deceptive and patently false, as a manufacturer cannot limit its warranty based on the use of an aftermarket or add-on product pursuant to the Magnuson-Moss Act.  See 15 U.S.C. 2302(c); 15 U.S.C. 2310; 16 C.FR. 700.10.

90.     The helmet manufacturers' representations that the use of aftermarket products would "void the NOCSAE certification" are deceptive and patently false, as NOCSAE has expressly and repeatedly stated that it "itself does not certify any product" and "it does not 'approve' or 'disapprove' of any product[.]"  Instead, it purports to merely "develop[] voluntary performance and test standards for athletic equipment[.]"

91.     Agents, employees, and/or representatives of Schutt Sports, Riddell, and Xenith have made false statements that appear directly intended to interfere with the marketing, distribution, and sale of the products that Mayfield Athletics has created.

92.     In particular, agents, employees, and/or representatives of Schutt Sports, Riddell, and Xenith have made express statements to Mayfield Athletics, as well as prospective clients or customers of Mayfield Athletics, that installing the S.A.F.E.Clip on a football helmet (1) would void the warranty for helmets manufactured by Schutt Sports, Riddell, and Xenith and (2) would void "the NOCSAE certification" of a particular helmet or faceguard.

93.     For example, one or more agents, employees, and/or representatives of Schutt Sports told dealers at the Sports, Inc., show on June 18, 2019, in Columbus, Ohio, that use of the S.A.F.E.Clip on a Schutt Sports helmet would void the helmet's warranty.

94.     Subsequently, Sports, Inc., dealers have declined to purchase S.A.F.E.Clips because of the statements made by Schutt Sports representatives at Sports, Inc., events.

95.     The effect of Defendants' statements and representations on Mayfield Athletics' potential sales is significant, as Sports, Inc., is a sporting goods buying organization with more than 500 members and 750 sales locations throughout all 50 states and Canada.

96.     Bob Fawley, President of Capital Varsity Sports, based in Oxford, Ohio, stated that he would "love" to sell the S.A.F.E.Clip, but he cannot offer S.A.F.E.Clips in the reconditioner market unless and until they are approved by the helmet manufacturers, and he cannot risk his business (by utilizing or offering the S.A.F.E.Clip) until that occurs.

97.     The effect of Defendants' statements and representations on Mayfield Athletics' potential sales is significant, as Capital Varsity Sports is a Team Sports Dealer and Sporting Goods Equipment Reconditioner, which reconditions and sells sports equipment throughout Michigan, Ohio, and Kentucky.

98.     Jeff Lester spoke to a representative named Erin from Riddell's marketing department during a Detroit Lions Event at Pontiac High School on July 25, 2019, regarding the use of the S.A.F.E.Clip on Riddell football helmets.  Erin informed Mr. Lester that using the S.A.F.E.Clip on a Riddell helmet would violate the helmet's warranty.

99.     The equipment manager of Brookfield Central High School in Brookfield, Wisconsin, asked the Riddell representative for the high school about the installation of S.A.F.E.Clips on Riddell helmets.  The representative informed him that Riddell would no longer "cover the insurance" in the event of an injury.  Joel Nellis, the head coach of the Brookfield Central High School football team, subsequently contacted Mayfield Athletics and noted that Riddell's statements regarding liability in the event of an injury might be an issue that could limit sales of the S.A.F.E.Clip, even though the S.A.F.E.Clip "seem[s] like a very useful product."

100.    Consistent with Defendants' public and private statements and representations, Rob Sgarlata, head coach of the Georgetown University Hoyas, expressly told Mayfield Athletics in June 2019 that he will not use a product on a helmet unless it originates from that helmet's manufacturer.

101.    The representations made by NOCSAE, Schutt Sports, Riddell, and Xenith have already precluded Mayfield Athletics from selling S.A.F.E.Clips and

will continue to preclude Mayfield Athletics from selling its product in the future unless Defendants' conduct is enjoined.

102.   Agents, employees, and/or representatives of NOCSAE, Riddell, Schutt Sports, and Xenith have made direct statements to agents, employees, and/or representatives of Mayfield Athletics that further reflect an intent to exclude Mayfield Athletics from the national market for football safety equipment and accessories, or otherwise ensure that Mayfield Athletics is unable to market or sell the S.A.F.E.Clip.

103.   Agents, employees, and/or representatives of NOCSAE, Riddell, Schutt Sports, and Xenith have made verbal and written statements confirming that the helmet manufacturers and NOCSAE have worked in combination and taken action in opposition to the marketing, sale, and use of aftermarket add-on products, including Mayfield Athletics' S.A.F.E.Clip.

104.   By way of example, Vincent Long, Engineering Manager of Schutt Sports, expressly stated the following by email on February 8, 2018:

> "Before we agree to do more testing at our expense we need to get some hard numbers on cost of the clips.  As an FYI, our current loop straps are molded in a 48 cavity hot runner mold in Asia.  Needless to say these are very cost effective.  Up to this point we have tested your product at no benefit to us and no cost to you and relayed the info.  As you are aware testing is not quick and if you have to go to a certified lab, it is not cheap.  As you mentioned in your email below, your original clip did result in facial contact of the guard to the chin which as you know is considered a failure.  ***In speaking with an engineer***

_**from another football helmet manufacturer he reported that they saw the same thing and this was with product that they had just recently bought off of your internet site.**_  Currently your website states that the S.A.F.E. clip works with several of our models.  Have you tested all these models to confirm that there is not an issue?"  [Emphasis added.]

105.  Based on Mayfield Athletics' disclosure and online purchasing documentation and history, there is no question that "the engineer from another football helmet manufacturer" referenced in Mr. Long's email was an engineer from Xenith.

106.  By discussing and disclosing its testing of the S.A.F.E.Clip with another football helmet manufacturer, Mr. Long breached the nondisclosure agreement between Mayfield Athletics and Schutt Sports.

107.  As another example, in 2017 and 2018, Defendant Kyle Lamson sent email correspondence to Mayfield Athletics that repeatedly questioned and undermined the viability of the S.A.F.E.Clip and Mayfield Athletics' testing of the product in accordance with NOCSAE standards.  Within this correspondence, Mr. Lamson made several statements plainly intended to deter or prevent Mayfield Athletics from selling and marketing the S.A.F.E.Clip, including the following examples (among others):

    a.  "_**To be quite frank, I find it <u>negligent</u> that you would put a product on the market that modifies an existing safety product without understanding the base level testing or consequences of the product you are selling**_."  [Emphasis added.]

    b.  "Additionally, I am not focused on Xenith helmets. I am focused on

clips in the field, regardless of the helmet manufacturer. These clips should not be in use on the field until you have completed your due diligence and determined the proper path forward for NOCSAE certification. Mike Oliver of NOCSAE pointed out to you very clearly in his email that you need to consider the facial contact pass/fail criteria. ***Additionally we have provided you information that in all the cases we have tested, the facemask made contact with the face when tested in accordance with NOCSAE ND087. There is no reason to assume that other manufacturers facemasks would perform differently.*** We have pointed out to you multiple deviations it appears Dr. Zhang has taken from the NOCSAE standard in the testing she has conducted for you. ***You need to proceed with an action plan to remove the clips from use immediately.***

"The engineering reviews you mention below are very important. But these need to be completed, along with determining the proper path forward for NOCSAE certification, before these clips are in use. Not after." [Emphasis added.]

108.   As indicated, Mr. Lamson told Mayfield Athletics that Xenith's testing revealed that use of the S.A.F.E.Clip on their helmets violated NOCSAE standards. Mayfield Athletics requested to review the results of the testing performed by Xenith.  Mr. Lamson refused to produce the results of the testing, claiming that the results had not been preserved.

109.   In sum, NOCSAE and the leading football helmet manufacturers have made concerted and combined efforts to exclude aftermarket add-on products from the national market for football safety equipment and accessories, thereby preserving that market share for the helmet manufacturers themselves.

110.   The leading helmet manufacturers have a strong motivation to conspire or otherwise combine to boycott the S.A.F.E.Clip or exclude it from the market for

football safety equipment and accessories.   If one manufacturer adopts the S.A.F.E.Clip for use on some or all of its helmets, or otherwise offers it as an add-on product with its helmets, non-adopting manufacturers could face product-liability exposure for their failure to utilize or offer the S.A.F.E.Clip given its proven ability to substantially reduce impact forces to the head each time a football player is hit.

### Injury to Mayfield Athletics

111.   Mayfield Athletics has attempted to enter the national market for football safety equipment and accessories, specifically by producing and distributing aftermarket products that have been shown to substantially improve the efficacy of football helmets.

112.   Mayfield Athletics' target market for the sale of the S.A.F.E.Clip includes over six million football participants (i.e., approximately 4,100,000 participants at the high school level, approximately 1,000,000 participants at the junior level, approximately 81,000 participants at the college level, and approximately 1,800 participants at the professional level), comprising a total potential market of approximately $782,000,000 for football safety equipment and accessories.

113.   Defendants' illegal, unlawful, and/or wrongful conduct has directly inhibited and/or interfered with Mayfield Athletics' ability to sell its products and thereby compete in the national market for football safety equipment and

accessories.  Most significantly, prospective purchasers of the S.A.F.E.Clip have expressly declined to purchase the product based on an errant belief, propagated by Defendants, that (1) use of the S.A.F.E.Clip will void a helmet manufacturer's certification that the helmet meets NOCSAE standards; (2) use of the S.A.F.E.Clip will result in football players being barred from playing in most football leagues; (3) use of the S.A.F.E.Clip will void a helmet's warranty; (4) use of the S.A.F.E.Clip will constitute an illegal act; (5) installation of the S.A.F.E.Clip will undermine the integrity or efficacy of a helmet; and/or (6) use of the S.A.F.E.Clip will subject the installer or user to personal liability.

### Injury to Competition

114.  The allegations set forth in this Complaint reflect the existence of multiple contracts, combinations, and/or conspiracies between the helmet manufacturers and NOCSAE to maintain a monopoly on the market for football safety equipment and accessories and thereby exclude Mayfield Athletics (and other manufacturers of aftermarket or add-on helmet products) from the national market for such products.

115.  Defendants' conduct has harmed, and continues to harm, Mayfield Athletics; it has harmed, and continues to harm, football players as well as current and potential consumers of football helmets and aftermarket products; and it has harmed, and continues to harm, competition in the sale of aftermarket products for

use on football helmets.

116.    Through   formal   and   informal   communications   that   installing aftermarket or add-on products to football helmets would void the helmets' warranties and the helmets' certification to NOCSAE standards, or would otherwise extinguish the helmet manufacturers' potential liability in the case of injury, Defendants have coerced consumers to purchase and use football helmets without the benefit of aftermarket or add-on products (like the S.A.F.E.Clip), which have the potential of substantially increasing the efficacy of helmets in preventing force to the head and related injury.

117.    Defendants have established and maintained monopoly power in the national market for football safety equipment and accessories by rendering it largely impossible for aftermarket or add-on product manufacturers to obtain certification that their products meet NOCSAE standards.  As a result, Defendants have made it virtually impossible for aftermarket or add-on product manufacturers to produce products that meet the mandatory rules for equipment that apply in the vast majority—if not all—leagues of organized football in the United States, including at the youth, college, and professional levels.

**Defendants' Refusal to Cease Their Unlawful Activities**

118.    On October 2, 2018, Mayfield Athletics sent, through its counsel, written correspondence to Defendant Gregg Hartley of NOCSAE, explaining the

ways in which NOCSAE's position regarding the use of aftermarket products on football helmets is unsustainable and contrary to law (Exhibit H).

119. Mayfield Athletics received no response to the October 2, 2018 correspondence.

120. In November 2018, Mayfield Athletics sent, through its counsel, written correspondence to Schutt Sports and Riddell requesting that the companies (1) cease and desist all statements, representations, and publications indicating that use of the S.A.F.E. Clip with their helmets would be illegal and/or would violate their respective helmet warranties, and (2) cease and desist all indications that use of the S.A.F.E.Clip would violate the applicable NOCSAE standards (Exhibit M).

121. Mayfield Athletics received no response from Schutt Sports to the November 2018 correspondence.

122. Although Riddell has participated in discussions with Mayfield Athletics since November 2018, it has never retracted, removed, or otherwise ceased making representations to the general public and potential purchasers of the Mayfield Athletics' products that use of the S.A.F.E.Clip would be illegal, would violate a helmet's warranty, and/or would violate the applicable NOCSAE standards.

## VI.  CAUSES OF ACTION

## COUNT I

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and
Section 2 of the Michigan Antitrust Reform Act (MCL 445.772)
(Contracts, Combinations, and/or Conspiracies Between
NOCSAE and the Helmet Manufacturers)**

123. Mayfield Athletics incorporates by reference all paragraphs set forth above as though fully set forth herein.

124. NOCSAE has formed multiple contracts, combinations, and/or conspiracies with Riddell, Schutt Sports, and Xenith in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

125. The first category of contracts, combinations, and/or conspiracies giving rise to Mayfield Athletics' antitrust claim consists of NOCSAE's licensing agreements with Riddell, Schutt, and Xenith.

126. Upon information and belief, each licensing agreement establishes a contractual arrangement under which the helmet manufacturers may use the names, trademarks, and phrases owned by NOCSAE in conjunction with the helmet companies' manufacture, sale, and/or marketing of products that satisfy the applicable NOCSAE standards, as long as the helmet manufacturers pay a fee to NOCSAE "for each unit of product sold, less returns, during the previous calendar quarter which bears or includes a Licensed Property on the product itself, on its packaging, or in its instructions, product documentation, or marketing materials (whether in hardcopy or electronic media)."

127.  Upon information and belief, NOCSAE's licensing agreements with Riddell, Schutt Sports, and Xenith each provide that *"[a]ny and all benefits arising from [the manufacturers'] use of the Licensed Property or any other intellectual property of NOCSAE <u>shall inure directly and exclusively to the benefit of NOCSAE.</u>"* (Emphasis added.)

128.  Accordingly, under the licensing agreements, NOCSAE and Riddell, Schutt Sports, and Xenith mutually benefit from (1) the sale of products licensed under the NOCSAE agreements and (2) the exclusion from the market of products that fail to meet, or are unable to meet, NOCSAE standards.

129.  The licensing agreements involve activities having a substantial effect on interstate commerce, in that the agreements govern the use of NOCSAE Licensed Property on the helmet manufactures' products and directly affect the sale, reconditioning, and use of the helmet manufacturers' products throughout the United States.

130.  Specifically, the licensing agreements provide a means by which NOCSAE and the leading helmet manufacturers, including Riddell, Schutt Sports, and Xenith, can achieve mutual financial benefit by promoting the sale of products manufactured by those companies and deterring the sale of products manufactured by entities that do not have, or are ineligible for, a licensing agreement with NOCSAE.

131.   NOCSAE's licensing agreements with Schutt Sports, Riddell, and Xenith unreasonably restrain trade by (1) diminishing consumer choice, (2) enhancing the market power of Schutt Sports, Riddell, and Xenith over the manufacturers of aftermarket or add-on products, and (3) collectively boycotting and/or excluding aftermarket or add-on products from the national market for football safety equipment and accessories.   The anticompetitive effect of these agreements is significantly heightened by NOCSAE's unmatched influence and power over the national football helmet industry, as set forth under Paragraphs 39-81, *supra.*

132.   The second category of contracts, combinations, and/or conspiracies giving rise to Mayfield Athletics antitrust claim originates from Riddell's, Schutt Sports', and Xenith's involvement in, and influence over, NOCSAE's leadership and operation.   Upon information and belief, employees, agents, and/or representatives of the nation's leading helmet manufacturers (including Riddell, Schutt, and/or Xenith), or individuals closely related to those companies, are current or former members of the NOCSAE Standards Committee and/or the NOCSAE board of directors, or they otherwise exhibit significant influence over the NOCSAE Standards Committee and the NOCSAE board of directors.   Upon information and belief, the contracts, combinations, and/or conspiracies giving rise to the instant cause of action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of

the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.772, were established during communications and/or meetings between the NOCSAE Standards Committee, the NOCSAE board of directors, NOCSAE Executive Director/Legal Counsel Mike Oliver, and/or employees, agents, and/or representatives of the nation's leading helmet manufacturers, including Riddell, Schutt, and/or Xenith.

133. Through contracts, combinations, and/or conspiracies involving NOCSAE and Riddell, Schutt, and/or Xenith, NOCSAE and the helmet manufacturers have established a framework—augmented by public statements and press releases—under which helmet manufacturers may arbitrarily and capriciously decide, at their sole discretion, in the event that an aftermarket or add-on product is installed on or used with one of their helmets, to (1) void the certification that the helmet meets NOCSAE standards, (2) allow the certification to remain unaffected, or (3) engage in additional certification testing.

134. As set forth under Paragraph 42, *supra*, the majority of football regulatory bodies require players to use helmets that are certified as meeting NOCSAE standards.

135. Based on the wrongful contracts, combinations, and/or conspiracies between NOCSAE, Riddell, Schutt, and/or Xenith—which have established and resulted in the framework, representations, and practices described under Paragraphs 39-109 and 125-133—football teams, football players, and other consumers of

football helmet-related equipment commonly believe that the use of an aftermarket add-on product—such as the S.A.F.E.Clip—will void a helmet's certification to NOCSAE standards, render the helmet ineligible for use in most forms or divisions of organized football, undermine the integrity or efficacy of the helmet, and/or subject the installer or user to personal liability. The erroneous beliefs resulting from the wrongful contracts, combinations, and/or conspiracies between NOCSAE and Riddell, Schutt Sports, and/or Xenith have resulted in restraint of trade and competition by largely excluding aftermarket add-on products (including the S.A.F.E.Clip) from the national market for football safety equipment and accessories.

136.   The contracts, combinations, or conspiracies between NOCSAE and Riddell, Schutt Sports, and/or Xenith constitute per se violations of state and federal antitrust law, or violations of state and federal antitrust law under the rule of reason, as they involve a group boycott of aftermarket add-on products for football helmets—including the S.A.F.E.Clip—and a collective effort to exclude those products from the national market for football safety equipment and accessories.

137. The contracts, combinations or conspiracies between NOCSAE, Riddell, Schutt, and/or Xenith have unreasonably restrained trade and suppressed competition in the national market for football safety equipment and accessories by deterring and/or precluding the sale and distribution of aftermarket add-on products

for football helmets.

138.   In addition to other relief, Mayfield Athletics is entitled to treble damages under Section 4 of the Clayton Act because Defendants' conduct has materially and substantially caused *direct* antitrust injuries to Mayfield Athletics. Among other things, Defendants' conduct has precluded Mayfield Athletics from fairly competing in the national market for football safety equipment and accessories and has caused Mayfield Athletics to lose sales, as demonstrated by the fact that prospective purchasers of the S.A.F.E.Clip have expressly declined to purchase the product based on the errant belief, propagated by Defendants, (1) that use of the S.A.F.E.Clip will void a helmet manufacturer's certification that a helmet meets NOCSAE standards and, accordingly, cause the helmet to be prohibited for use in most football leagues; (2) that installation of the S.A.F.E.Clip will undermine the integrity or efficacy of the helmet; and/or (3) that use of the S.A.F.E.Clip will subject the installer or user to personal liability.

139.   In addition to directly injuring Mayfield Athletics, Defendants' conduct has had an adverse effect on competition as a whole by largely excluding from the national market for football safety equipment and accessories aftermarket add-on products made by manufacturers other than Riddell, Schutt, or Xenith.

## **COUNT II**

**Private Standard Setting in Violation of Section 1 of the Sherman Act
(15 U.S.C. § 1) and Section 2 of the Michigan Antitrust Reform Act
(Mich. Comp. Laws § 445.772)**

140.   Mayfield Athletics incorporates by reference all paragraphs set forth above as though fully set forth herein.

141.   NOCSAE holds itself out as an independent entity that promulgates independent performance and testing standards for athletic equipment.

142.   NOCSAE publishes advisory standards which are created, revised, and approved by the NOCSAE Standards Committee.

143.   Under NOCSAE licensing agreements, the NOCSAE logo can be used on helmets that have been certified as complying with NOCSAE standards by SEI.

144.   The NOCSAE Standards Committee purports to comply with the due process requirements promulgated by the American National Standards Institute ("ANSI") for standards development bodies.

145.   According to NOCSAE, its "voluntary performance and test standards for athletic equipment . . . are available for adoption by any athletic regulatory body." (Exhibit A.)

146.   The criteria established by NOCSAE and the certification process required by NOCSAE have become the most influential standards in the football helmet industry.

147.    Because most organized football leagues require the use of helmets that

meet NOCSAE standards, consumers routinely decline to purchase football helmets or football helmet add-on products that have not been certified as meeting NOCSAE standards.

148.    As such, if a manufacturer cannot demonstrate that its product satisfies NOCSAE standards, it is at a significant disadvantage in the marketplace.

149.    Upon information and belief, employees, agents, and/or representatives of the nation's leading helmet manufacturers (including Riddell, Schutt, and/or Xenith), or individuals closely related to those companies, are current or former members of the NOCSAE Standards Committee and/or the NOCSAE board of directors, or they otherwise exhibit significant influence over the NOCSAE Standards Committee and/or the NOCSAE board of directors.

150.    As explained *supra* in Paragraphs 47-49, NOCSAE's financial viability is directly dependent on funds received from the nation's leading helmet manufacturers, including Riddell, Schutt, and Xenith.

151.    Correspondingly, NOCSAE has a financial interest in ensuring that its standards influence consumers' purchasing decisions, as it is primarily funded through the per-unit fees that it charges to equipment manufacturers for use of the trademarked NOCSAE logo(s) or phrase(s) on the products themselves, as well as product packaging, instructions, documentation, or marketing materials.

152.    As explained in Paragraphs 52-57, NOCSAE claims to have established

a "Severity Index" against which football helmets can be measured, but NOCSAE's own publications reveal that the Severity Index is illusory and, in fact, has very little meaning in determining or expressing the safety or efficacy of a particular football helmet.

153.   Accordingly, NOCSAE has created a standard that large-scale helmet manufacturers can manipulate and use to their advantage, especially considering that standard has no practical value or application.

154.   NOCSAE has arbitrarily decided that the component parts of a helmet facemask, including facemask attachment hardware like the S.A.F.E.Clip, constitute the "facemask system."

155.   NOSCAE has not developed a standard for mounting hardware, including facemask attachment hardware such as the S.A.F.E.Clip, on a football helmet.

156.   Even though NOCSAE has no standard for assessing or certifying facemask attachment hardware, NOCSAE has taken the position that facemask attachment hardware is necessarily *not certified*.

157.   Through its standard-setting procedures and public statements regarding the use of aftermarket or add-on products, described *supra* under Paragraphs 52-81 and 141-156, NOCSAE has made it impossible for the S.A.F.E.Clip to receive formal certification that it satisfies NOCSAE standards.

158. NOCSAE has made public statements expressly and implicitly disapproving and discouraging the purchase and use of aftermarket or add-on products for sports helmets.

159. NOCSAE has publicly stated in multiple written statements that a helmet manufacturer is authorized, at its sole discretion, to do any of the following when an aftermarket or add-on product is used with one of its helmets: (1) void the certification that the helmet meets NOCSAE standards; (2) allow the certification to remain unaffected; or (3) engage in additional certification testing.

160. In giving helmet manufacturers this choice, NOCSAE has rendered its performance and testing standards wholly meaningless, as helmet companies are essentially free to determine the circumstances under which their products will meet or be certified to NOCSAE standards. As such, helmet manufacturers have the authority to arbitrarily and capriciously decide when the NOCSAE logo should be used on its products and when the certification to NOCSAE standards is rendered void.

161. NOCSAE has allowed the football helmet manufacturers—from which NOCSAE receives the majority of its funding—to effectively control each step of the NOCSAE standards-creating and certification processes and thereby exclude aftermarket add-on products from the national market for football safety equipment and accessories.

162.   This abdication of NOCSAE authority places, in effect, all certifying power in the hands of the helmet manufacturers and provides an "authorized" means by which manufacturers can exclude aftermarket add-on products from the national market for football safety equipment and accessories, given that the majority of football regulatory bodies require players to wear football helmets that have been certified as meeting NOCSAE standards.

163.   The standards-setting and certification framework maintained by NOCSAE is arbitrary and expressly permits helmet manufacturers to manipulate NOCSAE standards, and certification to NOCSAE standards, in a discriminatory manner.

164.   On its website, NOCSAE represents that it is open to and encourages the submission of suggestions, objections, or other responses to its standards by any interested party.

165.   NOCSAE has ignored and refused to consider or respond to Mayfield Athletics' communications expressing concerns in relation to the standards-setting process maintained by NOCSAE.

166.   This system created and maintained by NOCSAE creates a closed group of football helmets manufacturers who may utilize illusory NOCSAE "certification" to enjoy a monopoly on the national market for football safety equipment and accessories.

167.  Through this manipulation of private standards-setting power, NOCSAE and the helmet manufacturers have largely excluded Mayfield Athletics' S.A.F.E.Clip from the national market for football safety equipment and accessories.

168.  In order to comply with antitrust law, private standard-setting by associations must be conducted in a nonpartisan manner offering procompetitive benefits.

169.  To be valid under antitrust law, the private-standard setting process must include safeguards that are sufficient to prevent the standard-setting process from being biased by members with economic interests in restraining competition.

170.  NOCSAE is subject to antitrust liability for direct injuries where the private standard-setting process is biased as a result of the standard-setting body being comprised of decisionmakers that share an economic interest in restraining competition, or where the process is otherwise influenced by persons or entities that share an economic interest in restraining competition.

171.  NOCSAE's standards-setting process does not include sufficient due process protections to prevent the process from being biased by members with economic interests in stifling product competition, or from otherwise being influenced by persons or entities that share an economic interest in restraining competition.

172.  The foregoing allegations demonstrate that the helmet manufacturers

and NOCSAE (through its role as a private, self-appointed standard-setting body) have unreasonably restrained trade in the national market for football safety equipment and accessories in violation of state and federal antitrust law under both a per se and rule-of-reason analysis.

173.   In addition to other relief, Mayfield Athletics is entitled to treble damages under Section 4 of the Clayton Act because Defendants' conduct has materially and substantially caused *direct* antitrust injuries to Mayfield Athletics. Among other things, NOCSAE's conduct has precluded Mayfield Athletics from competing in the national market for football safety equipment and accessories and has caused Mayfield Athletics to lose potential sales.

174.   While directly injuring Mayfield Athletics, NOCSAE's conduct has also had an adverse effect on competition as a whole by expressly deterring the use of—and largely excluding from the national market for football safety equipment and accessories—aftermarket or add-on products.

## COUNT III
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and
Section 2 of the Michigan Antitrust Reform Act (MCL 445.772)
(Contracts, Combinations, and/or Conspiracies Between the Helmet
Manufacturers)**

175.   Mayfield Athletics incorporates by reference all paragraphs set forth above as though fully set forth herein.

176.   The conduct, statements, and representations made by Riddell, Schutt

Sports, and Xenith through their agents, employees, and/or representatives, as set forth under Paragraphs 83-110 of this Complaint, reveal the existence of contracts, combinations, and/or conspiracies to boycott and deter the sale and use of aftermarket add-on products—most notably, the S.A.F.E.Clip—in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

177. By way of example, Vincent Long's email correspondence with an agent, employee, and/or representative of Xenith, described in Paragraphs 104-106, and Defendant Lamson's email correspondence, described in Paragraphs 107-108, reveal that Schutt Sports and Xenith combined and/or conspired to oppose the use, sale, and distribution of the S.A.F.E.Clip.

178. Through the conduct, statements, and representations made by the agents, employees, and/or representatives of Riddell, Schutt Sports, and Xenith, football teams, football players, and other consumers have been led to believe that use of the S.A.F.E.Clip with their helmets would be "illegal" and/or would subject the installer or user to personal liability.

179. The conduct, statements, and representations made by the agents, employees, and/or representatives of Riddell, Schutt Sports, and Xenith have repeatedly deterred football teams, football players, and other consumers from purchasing the S.A.F.E.Clip for fear that installing the clip on a helmet would violate

the applicable helmet warranty.

180.   Through the conduct, statements, and representations made by the agents, employees, and/or representatives of Riddell, Schutt Sports, and Xenith, football teams, football players, and other consumers have been repeatedly led to believe that players will be barred from participating in the sport under the rules promulgated and/or utilized by the majority of football regulatory bodies if they install the S.A.F.E.Clip on the companies' helmets.

181.   The contracts, combinations, and/or conspiracies between Riddell, Schutt Sports, and/or Xenith are manifestly anticompetitive and unreasonable, imposing an unreasonable restrain on trade.

182.   Contracts, combinations, and/or conspiracies between Riddell, Schutt Sports, and/or Xenith constitute per se violations of Section 1 of the Sherman Act, as they comprise a collective group boycott of aftermarket add-on products for football helmets—including the S.A.F.E.Clip—and have largely excluded aftermarket add-on product manufacturers, including Mayfield Athletics, from the national market for football safety equipment and accessories.

183.   Alternatively, the contracts, combinations, and/or conspiracies between Riddell, Schutt, and/or Xenith constitute violations of Section 1 of the Sherman Act under the rule of reason, as they have resulted in an unreasonable restraint of trade and suppressed competition.

184.   The contracts, combinations, and/or conspiracies between Riddell, Schutt, and/or Xenith—as reflected by the conduct, statements, and representations made by the agents, employees, and/or representatives of those entities—have harmed competition in the national market for football safety equipment and accessories by largely precluding the sale and distribution of aftermarket add-on products for football helmets.

185.   In addition to other relief, Mayfield Athletics is entitled to treble damages under Section 4 of the Clayton Act because Defendants' conduct has materially and substantially caused *direct* antitrust injuries to Mayfield Athletics. Among other things, Defendants' conduct has precluded Mayfield Athletics from fairly competing in the national market for football safety equipment and accessories and has caused Mayfield Athletics to lose potential sales, as demonstrated by the fact that prospective purchasers of the S.A.F.E.Clip have expressly declined to purchase the products based on an errant belief, propagated by Defendants, that using aftermarket products will (1) void a helmet's warranty, (2) constitute an illegal act, (3) result in football players being barred from playing in most football leagues, (4) undermine the integrity or efficacy of a helmet; and/or (5) subject the installer or user to personal liability.

186.   While directly injuring Mayfield Athletics, Defendants' conduct has also had an adverse effect on competition as a whole by expressly deterring the use

of—and largely excluding from the national market for football safety equipment and accessories—aftermarket or add-on products.

## COUNT IV
### Violations of Section 2 of the Sherman Act (15 U.S.C. § 2) and Section 2 of the Michigan Antitrust Reform Act (MCL 445.772) (Conspiracy to Monopolize)

187.  Mayfield Athletics incorporates by reference all paragraphs set forth above as though fully set forth herein.

188.  The facts set forth under Paragraphs 82-110 of this Complaint reveal the existence of a combination or conspiracy between Defendants Riddell, Schutt Sports, and/or Xenith to monopolize.

189.  The facts set forth under Paragraphs 82-110 of this Complaint also reveal overt, concerted acts performed in furtherance of the combination or conspiracy.

190.  Especially in light of the existence, function, and power of NOCSAE, Riddell, Schutt Sports, and/or Xenith possess sufficient market power to exclude competition from the national market for football safety equipment and accessories.

191.  Riddell, Schutt Sports, and/or Xenith acquired monopoly power within the national market for football safety equipment and accessories as a result, in part, of their involvement in NOCSAE's improper and unlawful standard-setting processes and framework.

192.  Mayfield Athletics and other aftermarket or add-on product

manufacturers have been largely excluded from the national market for football safety equipment and accessories as a result of Defendants' concerted, anticompetitive conduct.

193. Riddell's, Schutt Sports', and Xenith's public representations and private representations concerning the use of aftermarket or add-on products have a significant potential of forcing aftermarket or add-on product manufacturers to lose significant sales and possibly go out of business in light of the helmet manufacturers' combined monopoly power.

194. The combination or conspiracy to monopolize—as reflected by the conduct, statements, and representations made by the agents, employees, and/or representatives of Riddell, Schutt, and/or Xenith—has harmed competition in the national market for football safety equipment and accessories by stifling the sale and distribution of aftermarket add-on products for football helmets.

195. In addition to other relief, Mayfield Athletics is entitled to treble damages under Section 4 of the Clayton Act because Defendants' conduct has materially and substantially caused *direct* antitrust injuries to Mayfield Athletics. Among other things, Defendants' conduct has precluded Mayfield Athletics from fairly competing in the national market for football safety equipment and accessories and has caused Mayfield Athletics to lose potential sales.

196. While directly injuring Mayfield Athletics, Defendants' conduct has

also had an adverse effect on competition as a whole by largely excluding from the

market helmet add-on products made by manufacturers other than Riddell, Schutt,

or Xenith.

### COUNT V
**Attempted Monopolization in Violation of
Section 2 of the Sherman Act (15 U.S.C. § 2) and
Section 3 of the Michigan Antitrust Reform Act (MCL 445.773)
(Schutt Sports)**

197.   Mayfield Athletics incorporates by reference all paragraphs set forth

above as though fully set forth herein.

198.   As illustrated by examples set forth *supra* under Paragraphs 82-84, 88-

97, and 100-106, Schutt Sports has made numerous public and private efforts to deter

or otherwise discourage consumers from purchasing the S.A.F.E.Clip.

199.   Upon information and belief, Schutt Sports has attempted to

manufacture and patent a product that is functionally identical to the S.A.F.E.Clip.

200.   Upon information and belief, Schutt Sports' patent application was

denied because Mayfield Athletics' S.A.F.E.Clip is already patented.

201.   Upon information and belief, while attempting to develop and patent a

facemask attachment device that is functionally identical to the S.A.F.E.Clip, Schutt

Sports concurrently made public and private statements, through its agents,

employees, and/or representatives, that using the S.A.F.E.Clip on a Schutt Sports

helmet will void the helmet's warranty, will void any certification that the helmet

meets NOCSAE standards, and will "make the helmet or face mask *illegal* to use in most organized football leagues, games or other activities." (Emphasis added.)

202.   In simultaneously attempting to produce a product that is functionally identical to the S.A.F.E.Clip while making false or deceitful statements and representations to the public and individual consumers, Schutt revealed its intent to monopolize the national market for facemask attachment devices that reduce g-force impact when a helmet is hit.

203.   Based on its share of the related national market for football helmets, as well as other indicators, there is a dangerous probability that Schutt will be successful in monopolizing the market for facemask attachment devices that reduce g-force impact when a helmet is hit.

204.   In addition to other relief, Mayfield Athletics is entitled to treble damages under Section 4 of the Clayton Act because Schutt Sports' conduct has materially and substantially caused *direct* antitrust injuries to Mayfield Athletics.

205.   While directly injuring Mayfield Athletics, Schutt Sports' conduct has also had an adverse effect on competition as a whole.

## COUNT VI
## TORTIOUS INTERFERENCE
## WITH A BUSINESS RELATIONSHIP OR EXPECTANCY
## (SCHUTT SPORTS)

206.   Mayfield Athletics incorporates by reference all paragraphs set forth above as though fully set forth herein.

207.   Mayfield Athletics has valid business relationships and business expectancies with football teams, football players, football equipment distributors, and other purchasers of football equipment throughout the United States.

208.   Schutt Sports is aware of Mayfield Athletics' business relationships and expectancies through a variety of avenues.   Among other things, consumers interested in purchasing Mayfield Athletics' products have expressly asked Schutt Sports about the consequences of using aftermarket or add-on products on Schutt football helmets.

209.   Schutt Sports, through its employees, agents, and/or representatives, has informed Mayfield Athletics' current and potential clients and purchasers, through online publications and direct contact, that replacing the facemask clips on a Schutt Sports helmet with S.A.F.E.Clips will void the Schutt Sports warranty and/or void the certification that the helmet meets NOCSAE standards.

210.   In making these statements through its employees, agents, and/or representatives, or otherwise providing information or instructions that prompted its employees, agents, and/or representatives to make these statements, Schutt intended to interfere with Mayfield Athletics' current and future business relationships with football teams, football players, football equipment distributors, and other purchasers of football equipment, and/or deter those individuals and organizations form purchasing the S.A.F.E.Clip.

211.   Schutt Sports' representations that use of the S.A.F.E.Clip will void the Schutt Sports warranty and void the certification that the helmet meets NOCSAE standards have interfered with Mayfield Athletics' business relationships and expectancies with football teams, football players, football equipment distributors, and other purchasers of football equipment by deterring them from buying the S.A.F.E.Clip.

212.   Schutt Sports' interference with Mayfield Athletics' current and potential business relationships and expectancies has caused Mayfield Athletics substantial damages, consisting of lost sales and profits.

<u>**COUNT VII**</u>
**TORTIOUS INTERFERENCE**
**WITH A BUSINESS RELATIONSHIP OR EXPECTANCY**
**(RIDDELL)**

213.   Mayfield Athletics incorporates by reference all paragraphs set forth above as though fully set forth herein.

214.   Mayfield Athletics has valid business relationships and business expectancies with football teams, football players, football equipment distributors, and other purchasers of football equipment throughout the United States

215.   Riddell is aware of Mayfield Athletics' business relationships and expectancies through a variety of avenues.   Among other things, consumers interested in purchasing Mayfield Athletics' products have expressly asked Riddell about the consequences of using aftermarket or add-on products on Riddell helmets.

216.   Riddell, through its employees, agents, and/or representatives, has informed Mayfield Athletics' current and potential clients and purchasers, through online publications and direct contact, that replacing the facemask clips on a Riddell helmet with S.A.F.E.Clips will void the Riddell warranty and void the certification that the helmet meets NOCSAE standards, and that Riddell would no longer "cover the insurance" in the event of an injury.

217.   In making these statements through its employees, agents, and/or representatives, or otherwise providing information or instructions that prompted its employees, agents, and/or representatives to make these statements, Riddell intended to interfere with Mayfield Athletics' current and future business relationships with football teams, football players, football equipment distributors, and other purchasers of football equipment, and/or deter those individuals and organizations form purchasing the S.A.F.E.Clip.

218.   Riddell's representations that use of the S.A.F.E.Clip will void a football helmet's warranty, void the certification that the helmet meets NOCSAE standards, and/or cause Riddell to no longer cover the insurance in the event of an injury have interfered with Mayfield Athletics' business relationships and expectancies with football teams, football players, football equipment distributors, and other purchasers of football equipment by deterring them from buying the S.A.F.E.Clip.

219.   Riddell's interference with Mayfield Athletics' current and potential business relationships and expectancies has caused Mayfield Athletics substantial damages, consisting of lost sales and profits.

**COUNT VIII**
**TORTIOUS INTERFERENCE**
**WITH A BUSINESS RELATIONSHIP OR EXPECTANCY**
**(XENITH)**

220.   Mayfield Athletics incorporates by reference all paragraphs set forth above as though fully set forth herein.

221.   Mayfield Athletics has valid business relationships and business expectancies with football teams, football players, football equipment distributors, and other purchasers of football equipment throughout the United States.

222.   Xenith, through its employees, agents, and/or representatives, has informed Mayfield Athletics' current and potential clients and purchasers, through online publications and direct contact, that replacing the facemask clips on a Xenith helmet with S.A.F.E.Clips will void the Xenith warranty and/or void the certification that the helmet meets NOCSAE standards.

223.   In making these statements through its employees, agents, and/or representatives, or otherwise providing information or instructions that prompted its employees, agents, and/or representatives to make these statements, Xenith intended to interfere with Mayfield Athletics' current and future business relationships with football teams, football players, football equipment distributors, and other

purchasers of football equipment and/or deter these individuals and organizations form purchasing the S.A.F.E.Clip.

224.   Xenith's representations that use of the S.A.F.E.Clip will void the Xenith warranty and/or void the certification that the helmet meets NOCSAE standards have interfered with Mayfield Athletics' business relationships and expectancies with football teams, football players, football equipment distributors, and other purchasers of football equipment by deterring them from buying the S.A.F.E.Clip.

225.   Xenith's interference with Mayfield Athletics' current and potential business relationships and expectancies has caused Mayfield Athletics substantial damages, consisting of lost sales and profits.

226.   The statements and misrepresentations made by Defendant Lamson, described *supra* in Paragraphs 107, also reflect an intent to preclude the sale and marketing of the S.A.F.E.Clip and otherwise interfere with Mayfield Athletics' business relationships and expectancies through the removal of the S.A.F.E.Clip from the market for football safety equipment and accessories and from the playing field.

<u>**COUNT IX**</u>
**TORTIOUS INTERFERENCE**
**WITH A BUSINESS RELATIONSHIP OR EXPECTANCY**
**(NOCSAE)**

227.   Mayfield Athletics incorporates by reference all paragraphs set forth

above as though fully set forth herein.

228.   Mayfield Athletics has valid business relationships and business expectancies with football teams, football players, football equipment distributors, and other purchasers of football equipment throughout the United States.

229.   Individuals and organizations have expressed an interest in purchasing, or an intent to purchase, the S.A.F.E.Clip for individual or team use, but ultimately declined to purchase the product based on the belief, supported by NOCSAE publications and communications, that the use of an aftermarket or add-on product may void a helmet's certification to NOCSAE standards.

230.   NOCSAE was aware, through Mayfield Athletics' discussions and correspondence with Defendant Mike Oliver, Defendant Gregg Hartley, and others, that Mayfield Athletics had existing and potential contracts and business deals with football teams, football players, football equipment distributors, and other purchasers of football equipment for purchase of the S.A.F.E.Clip.

231.   After Mayfield Athletics began marketing its products, NOCSAE issued several press releases and publications stating that, when an add-on item is added to a helmet, the manufacturer of the helmet retains the discretion to declare its NOCSAE certification void, allow its NOCSAE certification to remain unaffected, or engage in additional testing of the new model with the add-on product.

232.   Specifically, NOCSAE has taken the position that (1) facemask

attachment hardware is necessarily not certified, even though NOCSAE has no standard for assessing or certifying facemask attachment hardware, and (2) the maker of a facemask or helmet retains the option of voiding its NOCSAE certification in the event that after-market hardware (such as the S.A.F.E.Clip) is used with the helmet or facemask.

233.   NOCSAE has repeatedly made public statements expressly discouraging the use of aftermarket or add-on products for football helmets.

234.   Through all of these statements and actions, NOCSAE intentionally interfered with Mayfield Athletics' business relationships and expectancies.

235.   NOCSAE's conduct has permitted and given credence to Riddell's, Schutt Sports', and Xenith's representations of authority to declare their NOCSAE certifications void and claim warranty violations based on the installation or use of aftermarket products, when, in fact, federal law prevents a manufacturer from disclaiming or voiding a warranty for the installation of an aftermarket product.  See 15 U.S.C. 2302(c); 15 U.S.C. 2310; 16 C.FR. 700.10.

236.   As a result of NOCSAE's significant influence and control over the products that are permitted for use in the majority of organized football leagues and programs in the United States, NOCSAE's representations and actions have caused Mayfield Athletics to incur damages consisting of lost contracts and profits based on potential customers' beliefs, from NOCSAE communications and publications,

that (1) helmet add-on products should not be used; (2) the S.A.F.E.Clip does not meet NOCSAE standards, and (3) the S.A.F.E.Clip is unable to be certified as meeting NOCSAE standards.

## VII.   RELIEF REQUESTED

WHEREFORE, Mayfield Athletics respectfully requests that this Honorable Court order the following relief:

A.    The entry of a declaratory judgment under 28 U.S.C. §§ 2201-2202 declaring that Defendants NOCSAE, Schutt Sports, Xenith, and Riddell have violated Michigan and federal antitrust law;

B.    Enter a permanent injunction requiring Defendants to terminate, remove, or otherwise eradicate all public and private statements and representations that the installation or use of an add-on or aftermarket product with a football helmet may (1) void the helmet's warranty, (2) render its certification to NOCSAE standards void, (3) constitute illegal activity, or (4) affect the insurance- or liability-related responsibilities of a helmet manufacturer;

C.    Enter a permanent injunction requiring Defendants to terminate, remove, or otherwise eradicate all public and private representations that Mayfield Athletics' products are unable to meet or otherwise comply with NOCSAE standards;

D.    Enter a permanent injunction enjoining Defendants from performing any other acts in violation of the state and federal antitrust law and Michigan tort law;

E.    Enter a money judgment awarding Mayfield Athletics treble damages under Section 4 of the Clayton Act (15 U.S.C. § 15(a)), incorporating actual damages under Section 8 of the Michigan Antitrust Reform Act (Mich. Comp. Laws § 445.778), as compensation for the antitrust injury directly sustained by Mayfield Athletics;

F.      Enter a money judgment awarding Mayfield Athletics damages for all of the losses that it has incurred based on Defendants' tortious interference with Mayfield Athletics' valid business relationships and expectancies; and

G.      Enter a judgment awarding Mayfield Athletics all other relief to which this Court finds that it is entitled, plus all interest, costs, and attorney fees recoverable under the law (including 15 U.S.C. § 15(a) and/or any other provision of law), and/or through equitable relief.

Respectfully submitted,

**HEWSON & VAN HELLEMONT P.C.**

Dated:  September 16, 2019

 */s/ James F. Hewson*
JAMES F. HEWSON (P27127)
DIANE L. HEWSON (P44628)
LYNN B. SHOLANDER (P78839)
Hewson & Van Hellemont, P.C.
Attorneys for Mayfield Athletics
25900 Greenfield Road
Suite 650
Oak Park, MI 48237
(248) 968-5200/(248) 968-5270 fax

## JURY DEMAND

Mayfield Athletics, through its attorneys, Hewson and Van Hellemont P.C., hereby demands a trial by jury in the above-captioned matter.

Respectfully submitted,

**HEWSON & VAN HELLEMONT P.C.**

Dated:  September 16, 2019                */s/ James F. Hewson*
                                                    JAMES F. HEWSON (P27127)
                                                    DIANE L. HEWSON (P44628)
                                                    LYNN B. SHOLANDER (P78839)
                                                    Hewson & Van Hellemont, P.C.
                                                    Attorneys for Mayfield Athletics
                                                    25900 Greenfield Road
                                                    Suite 650
                                                    Oak Park, MI 48237
                                                    (248) 968-5200/(248) 968-5270 fax

## PROOF OF SERVICE

I declare under penalty of perjury that on September 16, 2019, I served a copy of the foregoing document upon counsel of record via electronic filing. The above statement is true to the best of my knowledge and information.

*/s/ Michelle L. Alexander*
Michelle L. Alexander