UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HOBART-MAYFIELD, INC., D/B/A
MAYFIELD ATHLETICS,

    Plaintiff,

            v.

NATIONAL OPERATING COMMITTEE ON
STANDARDS FOR ATHLETIC EQUIPMENT,
ET AL.,

    Defendants.

_____/

Case No. 19-cv-12712

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO
DISMISS [#62]**

**I. INTRODUCTION**

On September 16, 2019, Plaintiff Hobart-Mayfield, Inc. ("Mayfield") filed the

instant action against Kranos Corporation ("Schutt Sports"), Riddell, Inc., Xenith,

LLC, Gregg Hartley, Michael Oliver, Vincent Long, and Kyle Lamson (collectively

referred to as the "Manufacturer Defendants") as well as the National Operating

Committee on Standards for Athletic Equipment ("NOCSAE").[1]  *See* ECF No. 1.

---

[1] On December 23, 2020, Defendant Kranos Corporation, doing business as Schutt
Sports, filed a Suggestion of Bankruptcy and Notice of Operation of the Automatic
Stay.  ECF No. 64.  The Notice indicates that Defendant voluntarily filed for
bankruptcy on December 18, 2020. While the Court acknowledges the petition filed
in the United States Bankruptcy Court for the District of Delaware, the ultimate
disposition of this case is not affected by Defendant's filing.

Plaintiff filed an Amended Complaint on October 10, 2020.  ECF No. 61.  Plaintiff

maintains that Defendants have unlawfully interfered with the sale of its helmet

aftermarket product, the S.A.F.E.Clip, in violation of the Sherman Act and the

Michigan Antitrust Reform Act.  *Id.*

Presently before the Court is Defendants' Motion to Dismiss, filed on

November 11, 2020.  ECF No. 62.  Plaintiff filed its Response in Opposition on

December 11, 2020.  ECF No. 63.  Defendants' Reply was filed on December 28,

2020.  ECF No. 65.  The Court held a hearing on this matter on April 13, 2021.  For

the reasons that follow, the Court will **GRANT** Defendants' Motion to Dismiss

[#62].

## II. BACKGROUND

### A. Factual Background

Plaintiff Hobart-Mayfield, Inc. is the marketer, distributor, and seller of a

football helmet shock absorber called the "S.A.F.E.Clip."    ECF No. 61,

PageID.1340.  The S.A.F.E.Clip is an aftermarket "add-on" product that "can be

retrofitted to most existing helmets and facemasks" and purports to reduce the

impact to the football player's helmet each time they are hit.  *Id.* at PageID.1358.

Mayfield was formed in 2014 and received fully patented status for the S.A.F.E.Clip

in 2017.  *Id.*  Plaintiff states that "several generations of the S.A.F.E.Clip were

extensively tested and refined" between 2016 and 2018.  *Id.*  Plaintiff further claims

that "the use of the S.A.F.E.Clip resulted in force reductions as high as 35% per hit" after multiple rounds of helmet testing.  *Id.* at PageID.1359.

The National Operating Committee on Standards for Athletic Equipment ("NOCSAE") is a nonprofit body that "develops voluntary performance and test standards for athletic equipment that are available for adoption by any athletic regulatory body." *Id*. at PageID.1350, 1424.   The parties agree that the majority of football regulatory bodies require most players, from youth leagues to the NFL, to use football helmets and facemasks that comply with NOCSAE standards.  *Id.* Plaintiff contends that under this structure, equipment that does not meet NOCSAE standards "are almost entirely excluded from the respective markets for football helmets and football helmet Add-ons." *Id.* at PageID.1356.

Plaintiff states that NOCSAE enters into licensing agreements with certain football helmet manufacturers, including Defendants Riddell, Schutt Sports, and Xenith, which allows them to utilize NOCSAE-trademarked logos and phrases. *Id.* at PageID.1371.  Plaintiff alleges that these Defendants together control nearly one hundred percent of the relevant football helmet and Add-on or replacement part market. *Id.*

NOCSAE published various press releases, some from 2013 and others from 2018, that relate to the certification of helmets with Add-on products attached.  The 2013 press releases states in relevant part:

3

> The addition of an item(s) to a helmet previously certified without those item(s) creates a new untested model.  Whether the add-on product changes the performance or not, the helmet model with the add-on product is no longer "identical in every aspect" to the one originally certified by the manufacturer.
>
> When this happens, the manufacturer which made the original certification has the right, under the NOCSAE standards, to declare its certification void.  It also can decide to engage in additional certification testing of the new model and certify the new model with the add-on product, but it is not required to do so.

*Id.* at PageID.1522 (emphasis added).  Thus, the addition of an Add-on product to a previously NOCSAE-certified helmet would create a new untested—and uncertified—helmet model.  *Id.*  However, the 2013 press release statements did specify that "[c]ompanies which make add-on products for football helmets have the right to make their own certification of compliance with NOCSAE standards on a helmet model, but . . . the certification and responsibility for the helmet/third-party product combination would become theirs, (not the helmet manufacturer)."  *Id.*

The 2018 press release statements addressed a different position on this issue, providing now that:

> The addition of an item(s) to a helmet previously certified without the item(s) creates a new untested model. Whether the add-on product improves the performance or not, the helmet model with the add-on product is no longer "identical in every aspect" to the one originally certified by the manufacturer.
>
> .......
>
> When this happens, the helmet manufacturer has the right, under the NOCSAE standards, to declare its certification void. It may elect to allow the certification to remain unaffected, or it may also decide to engage in additional

4

certification testing of the new model and certify the new model with the add-on product, but it is not required to do so.

*Id.* at PageID.1525.  This release indicates that third party add-on manufacturers could no longer independently acquire NOCSAE certification for the helmets with Add-on products.

Plaintiff thus alleges that the Manufacturer Defendants' right to declare its NOCSAE certification void constitutes an unreasonable restraint on trade that interferes with sales of the S.A.F.E.Clip.  Plaintiff points specifically to the licensing agreements between NOCSAE and the Manufacturer Defendants as evidence of a conspiracy to exclude the S.A.F.E.Clip from the market.  ECF No. 61, PageID.1367. These licensing agreements, Plaintiff claims, "are unreasonably anticompetitive because all of NOCSAE's legitimate standard setting objectives could be served with less restrictive licensing terms."  *Id.*  These allegations form the basis for Plaintiff's claims for violations of the Sherman Act and Michigan Antitrust Reform Act as well as tortious interference with a business relationship or expectancy by all Defendants.  *Id.*

### B. Procedural Background

Plaintiff filed its initial Complaint against Defendants on September 16, 2019. *See* ECF No. 1.  Pursuant to multiple stipulations, Defendants were granted additional time to respond to the Complaint.  *See* ECF Nos. 5, 10, 20.  Defendants subsequently moved to dismiss Plaintiff's Complaint in late 2019 and early 2020.

5

ECF Nos. 18, 31.  The dismissal motions were fully briefed following a stipulated extension of time for Plaintiff to file its Response.  *See* ECF No. 25.

On October 19, 2020, this Court granted Plaintiff's Motion for Leave to File an Amended Complaint and consequently mooted Defendants' outstanding Motions to Dismiss.  *See* ECF No. 60.  Defendants now move to dismiss Plaintiff's First Amended Complaint.

### III. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows the court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6).  To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must comply with the pleading requirements of Federal Rule of Civil Procedure 8(a)(2).  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).  Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  To meet this standard, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 678–80 (applying the plausibility standard articulated in *Twombly*).

When considering a Rule 12(b)(6) motion to dismiss, the Court must construe the complaint in a light most favorable to the plaintiff and accept all of his factual allegations as true. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). While courts are required to accept the factual allegations in a complaint as true, *Twombly,* 550 U.S. at 556, the presumption of truth does not apply to a claimant's legal conclusions. *See Iqbal,* 556 U.S. at 678. Therefore, to survive a motion to dismiss, the plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters v. City of Cleveland,* 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555) (internal citations and quotations omitted).

## IV. DISCUSSION

Plaintiff asserts six counts against Defendants: (1) Violation of the Sherman Act and the Michigan Antitrust Reform Act by all Defendants (Count I); (2) Conspiracy to Restrain Trade in violation of the Sherman Act and the Michigan Antitrust Reform Act by all Defendants (Count II); (3) Tortious Interference with a Business Relationship or Expectancy by Schutt Sports (Count III); (4) Tortious Interference with a Business Relationship or Expectancy by Riddell (Count IV); (5) Tortious Interference with a Business Relationship or Expectancy by Xenith (Count V); and (6) Tortious Interference with a Business Relationship or Expectancy by

NOCSAE (Count VI).  The Court will address the claims in their relative pairings below.

### A. Count I

Section 1 of the Sherman Act prohibits contracts or conspiracies "in restraint of trade or commerce among the several States." 15 U.S.C. § 1; *see Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018).[2]  The Supreme Court has emphasized that only *unreasonable* restraints of trade are considered in violation of the Sherman Act.  *Id.*  Thus, in order to establish a violation of Section 1, a plaintiff must demonstrate that there is: (1) an agreement, which may be in the form of a contract, combination, or conspiracy; (2) affecting interstate commerce; (3) that imposes an unreasonable restraint of trade.  *See White and White, Inc. v. American Hospital Supply Corp.*, 723 F. 2d 495, 504 (6th Cir. 1983)*; see also United States v. Blue Cross Blue Shield of Michigan*, 809 F. Supp. 665, 671 (E.D. Mich. 2011).

"To plead unlawful agreement, a plaintiff may allege either an explicit agreement to restrain trade, or 'sufficient circumstantial evidence tending to exclude the possibility of independent conduct.'"  *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 457 (6th Cir. 2011) (quoting *In re Travel Agent*

---

[2] "Because the Michigan Anti-Trust statute and the Sherman Anti-Trust Act mirror each other, [the court] appl[ies] the same analysis to both the federal and state anti-trust claims."  *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 368 n.1 (6th Cir. 2003).

*Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009)).  But "[u]nder either approach, the facts alleged must 'plausibly suggest[],' rather than be 'merely consistent with,' an agreement to restrain trade in violation of the Sherman Act." *Id.*

In its first claim, Plaintiff alleges that the licensing agreements between the Manufacturer Defendants and Defendant NOCSAE permit unreasonable restraints on trade regarding the certifications of helmets with Add-on products attached.  ECF No. 61, PageID.1408.  However, Plaintiff clarifies in its Response brief that Count I is based not just on the licensing agreements, but also "on terms NOCSAE added beyond the four corners of the initial agreements themselves."  ECF No. 63, PageID.1618.  Plaintiff's assertion is accordingly reliant on the difference between the 2013 and 2018 NOCSAE press releases and the lost ability for Add-on manufacturers to independently obtain NOCSAE helmet certification.  *Id.* Defendants oppose this argument, maintaining instead that the licensing agreements were never amended and contain standard provisions that do not unreasonably restrain trade with Add-on product manufacturers.  *See* ECF No. 65, PageID.1938-39.

During the hearing on this matter, the parties disagreed about the characterization of a third NOCSAE document, this time from 2015.  *See* ECF No. 61, PageID.1455.  Defendants state that the NOCSAE policy changed not in 2018 but "three years earlier in 2015, when it began requiring all certifications of

compliance with NOCSAE standards to be made by an American National Standards Institute accredited product-certification body . . . and thereby eliminated the self-certification option."   ECF No. 62, PageID.1590.   Plaintiff acknowledges this document, but maintains that the 2013 policy regarding Add-on manufacturer NOCSAE certifications was viable until the 2018 press release expressly removed that language.

The ultimate resolution of this Count, however, does not hinge on whether NOCSAE's policy regarding Add-on manufacturer certifications changed in 2015 or 2018.   Plaintiff's first Count is deficient because it has not demonstrated that the licensing agreements themselves, or the impact of the 2013, 2015, or 2018 NOCSAE-related documents, were unreasonable restraints on trade.   The change in policy reflected the omission of the Add-on manufacturer certification—but did not impact what the Manufacturer Defendants could or could not do with NOCSAE certifications.   As Plaintiff's First Amended Complaint notes, the Manufacturer Defendants always had "the right, under NOCSAE standards, to declare its certification void" in 2013.   ECF No. 61, PageID.1365.   Defendants are correct to emphasize that neither the form agreements nor the press statements "require that any action be taken with respect to add-ons, much less require their exclusion."   ECF No. 65, PageID.1938.

Plaintiff thus fails to meet the *Watson Carpet* standard demonstrating "either an explicit agreement to restrain trade, or 'sufficient circumstantial evidence tending to exclude the possibility of independent conduct.'"  648 F.3d at 457.  In *Watson Carpet*, the plaintiff sufficiently alleged that the defendants actively worked together to design a plan and exclude the plaintiff from the market by making false and public accusations about the plaintiff's business and unilaterally refusing to sell any of its products in the market.  *See id.* at 455 (describing how the defendants falsely claimed that the plaintiff "used drugs, sold drugs, cheated his customers, slept with his employees, had financial problems, had trouble with the IRS, and was in the mob," while also instructing employees to "keep [the p]laintiff from getting the sale, even if it meant losing money on the sale.").

Here, Plaintiff's claims in the First Amended Complaint fall far short of this standard—there are no allegations of any communication, agreement, or conspiratorial conduct between Defendants about the policy change or any of the Manufacturer Defendants' licensing agreements.  *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 907 (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 768 (1984)) ("[T]here must be direct or circumstantial evidence that reasonably tends to prove that the defendant and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.").  Further, Defendants emphasize that these license agreements applied to "sports equipment

manufacturers" more broadly, including helmets and other equipment for baseball, softball, ice hockey, lacrosse, and polo.   ECF No. 62, PageID.1588.   Plaintiff's allegations do not adequately explain how these widely used licensing agreements are evidence of a conspiracy specifically executed by football helmet manufacturers.

Plaintiff additionally fails to demonstrate how the certification policy modification was unreasonable in light of Defendants' competing and valid interests in maintaining their brand credibility and helmet safety standards.   Thus, Count I does not provide sufficient evidence beyond mere speculation that demonstrates a conspiracy derived from the licensing agreements and the NOCSAE press releases. The Court will accordingly grant Defendants' Motion as to Count I.

### B. Count II

In its second claim, Plaintiff argues that Defendants have engaged in an overarching conspiracy "to decertify any football helmets to which consumers have applied helmet Add-ons *regardless* of whether the helmet and Add-on collectively meet[] NOCSAE standards" in violation of Section 1 of the Sherman Act.   ECF No. 61, PageID.1410 (emphasis in original).   This allegation is purportedly supported by various circumstantial factors that establish Defendants' involvement in unlawful, parallel conduct to restrain trade.   In response, Defendants argue that the majority of Plaintiff's arguments are boilerplate allegations devoid of the requisite detail to survive a dismissal motion.   See ECF No. 62, PageID.1593.   Defendants further

maintain that the circumstantial evidence supports their position and emphasizes their independent concerns about the S.A.F.E.Clip product's safety.

A plaintiff must plead more than parallel conduct to maintain their claim; as described in *Twombly*, "parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." 550 U.S. at 557. "An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." *Id.* (internal quotations omitted).

Accordingly, a plaintiff must provide sufficient circumstantial evidence, also called "plus factors," that tend to exclude the possibility of independent conduct. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 907. The Sixth Circuit has provided various "plus factors" that a district court may employ in its analyses, including "(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to conspire." *Id.*

Here, Plaintiff's second Count relies heavily on the allegation that Defendants are voiding, or threatening to void, their helmet NOCSAE certifications if third-party Add-on products are attached, even when the combined product passes the required NOCSAE testing standards.  *See* ECF No. 63, PageID.1621-22.  Plaintiff supports its claim by noting that Zuti, a non-party Add-on manufacturer, purportedly developed faceguards that pass NOCSAE certification standards with Defendant Riddell's helmets.  *See* ECF No. 61, PageID.1387.  But even with this certification, "Riddell nevertheless still voids its helmet certifications if the helmets are used with a Zuti faceguard."  *Id.*  This is an example, Plaintiff argues, of the ongoing conspiracy to entirely exclude all Add-on products like the S.A.F.E.Clip from the market.

As Defendants point out, however, the claims in the First Amended Complaint must derive from Mayfield's experiences; allegations as to other Add-on products, such as the Zuti faceguard, cannot be substituted to form the basis of Plaintiff's own claims.  Plaintiff's claims must therefore "stand or fall on its allegations relating to Mayfield and the S.A.F.E.Clip." ECF No. 62, PageID.1596.  When asked about this during the hearing, Plaintiff conceded that First Amended Complaint contains no allegations stating that Mayfield submitted evidence to the Manufacturer Defendants that demonstrated its product, the S.A.F.E.Clip, complied with NOCSAE standards. While the product underwent various rounds of testing between 2016 and 2018, it is

not pled that Defendants (1) knew whether or not Plaintiff's product was NOCSAE-compliant; (2) received information about Plaintiff's most recent testing results; or (3) voided or threatened to void their NOCSAE-compliance with the S.A.F.E.Clip product attached.  Without these facts, Plaintiff does no more than speculate that its product *would* be rejected even if it were in full compliance with NOCSAE standards—but mere speculation does not survive the pleading requirements established under *Twombly*.

In an attempt to illustrate additional "plus factors" indicating Defendants' broader conspiracy, Plaintiff also points to specific communications between Defendants Schutt and Xenith in 2018 about testing an older model—the only one seemingly available to them—of the S.A.F.E.Clip.  ECF No. 61, PageID.1391. While the email states that the product failed certain testing performed independently by both Schutt and Xenith, Plaintiff highlights that this communication between the parties was in purported violation of nondisclosure agreements.  *Id.*  But the Court is not persuaded that this exchange evinces an attempt by Defendants to "coordinate their opposition to the product and further lessen competition from Mayfield Athletics and other Add-on manufacturers."  *Id.* at 1392. To the contrary, the communication plainly illustrates that Defendants found that an older version of the S.A.F.E.Clip failed NOCSAE compliance—which Plaintiff does not dispute.  The Court agrees with Defendants that it was "only natural" for the

Manufacturer Defendants to individually reject the use of a product that changed their helmets absent ironclad assurance as to its safety, especially considering the potential for serious head injuries and concussions.  *See* ECF No. 62, PageID.1585. Thus, without more, this claim does not "invest[] either the action or inaction alleged with a plausible suggestion of conspiracy."  *Twombly*, 550 U.S. at 565.

The additional circumstantial factors Plaintiff provides similarly fail to rise above the level of speculation with neutral, parallel conduct.  For example, Plaintiff references the Manufacturer Defendants' purported control of the NOCSAE board and the potential for collusion where "Defendants routinely attended trade association meetings."  ECF No. 63, PageID.1627.  But mere presence on either a board or at a trade association meeting, without further factual allegations, does not amount to a conspiracy claim.  *See, e.g., In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (the allegation "is in entirely general terms without any specification of any particular activities by any particular defendant; it is nothing more than a list of theoretical possibilities . . . .").  Additionally, exhibits to the First Amended Complaint reveal that NOCSAE's board contains representation from at least ten different organizations, not just football helmet manufacturers.  *See* ECF No. 61, PageID.1424-25 (listing, for example, the American Medical Society for Sports Medicine and the National Athletic Trainers Association as additional NOCSAE board members).

Thus, without more information, such as (1) when conspiratorial communication and conduct occurred between Defendants; (2) which Defendants communicated with one another to influence NOCSAE policy; or (3) how Defendants acted in concert to unilaterally exclude the S.A.F.E.Clip from the market, the Court cannot find Plaintiff's second Count sufficient to withstand dismissal. Instead, the First Amended Complaint largely contains bare legal conclusions or allegations of unilateral conduct that remain in neutral territory and does not rise to the level of conspiratorial action. *See* ECF No. 62, PageID.1578. The Sixth Circuit has routinely dismissed cases on similar grounds, holding that "[g]eneric pleading, alleging misconduct against defendants without specifics as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (specifying that "nowhere did Plaintiffs allege when Defendants joined the [] conspiracy, where or how this was accomplished, and by whom or for what purpose.").

Further, during the hearing, the parties both discussed whether Defendants were acting contrary to their respective economic interests by declining to adopt the S.A.F.E.Clip to their helmets. Plaintiff argued that "NOCSAE has an economic interest in maintaining safety standards by certifying helmet/Add-on combinations when testing data establishes that they reduce risks," and that the policy change

17

reflected in the 2018 press release contradicts this interest. ECF No. 63, PageID.1626. But Defendants do not dispute that both NOCSAE and the Manufacturer Defendants share this strong economic interest in maintaining safety standards and engaging with NOCSAE-compliant Add-ons. Instead, as discussed *supra*, Plaintiff fails to allege that it ever provided Defendants with a NOCSAE-compliant S.A.F.E.Clip.

Consequently, Defendants are not acting contrary to their economic interests by adhering to publicly available safety standards and ensuring that their credibility as institutional and market actors are maintained. As Defendants note, it was prudent for them to decline to use the S.A.F.E.Clip at this juncture because helmet manufacturers have an equally "strong incentive and moral imperative to control the quality of their products . . . [i]f they do not, safety is compromised, and they subject themselves to negative press and liability." ECF No. 62, PageID.1585. Given these competing objectives, Plaintiff's Count II fails to plead sufficient "plus factors" of circumstantial evidence demonstrating an overarching conspiracy here.

Finally, while Plaintiff has not met the standards to plead a conspiracy, the Court also notes its agreement with Defendants' assertion that the First Amended Complaint does not contain adequate facts to establish either a *per se* violation of antitrust law or a violation under the rule of reason. *See* ECF No. 62, PageID.1597. Neither Count I or II allege that Defendants "boycott[ed] suppliers or customers in

18

order to discourage them from doing business with a competitor," a general requirement for *per se* violations. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1013 (6th Cir. 1999) (quoting *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986)).  Given Defendants' competing interests in safety and standards adherence, this case clearly does not involve "agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Lie v. St. Joseph Hosp. of Mount Clemens*, *Mich.*, 964 F.2d 567, 569 (6th Cir. 1992).

Plaintiff's argument fails under the rule of reason inquiry as well, which provides that the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Indiana Fed'n of Dentists*, 476 U.S. at 458 (quoting *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918)). As the Court has discussed, Plaintiff has failed to demonstrate how NOCSAE's policy change unreasonably restrained trade or fostered an anticompetitive market. The First Amended Complaint fails to rise above the level of mere speculation, especially with regard to the S.A.F.E.Clip specifically.  Without this evidence, Plaintiff cannot adequately plead a violation of antitrust law under the rule of reason either.

Accordingly, the Court will also dismiss Plaintiff's Count II.

## C. Counts III-VI

Plaintiff's remaining Counts allege that Defendants individually and intentionally interfered with Mayfield's "ongoing business relationships and business expectancies with football teams, football players, football equipment distributors, and other purchasers of football equipment throughout the United States." ECF No. 61, PageID.1410-11. Defendants collectively deny Plaintiff's claims, arguing instead that Plaintiff fails to establish any malicious conduct by Defendants or any valid business expectancies that could maintain Counts III through VI. *See* ECF No. 62, PageID.1598-99.

In order to state a claim for intentional interference with a business relationship or expectation, a plaintiff must allege the following elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy by defendant; (3) an intentional interference by defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the plaintiff. *Badiee v. Brighton Area Sch.*, 265 Mich. App. 343, 365-66, 695 N.W.2d 521 (2005). The third prong, intentional interference, requires that the plaintiff demonstrate with some specificity "affirmative acts by the defendant that corroborate the improper motive of the interference." *BPS Clinical Labs. v. Blue Cross & Blue Shield of Michigan*, 217 Mich. App. 687, 699, 552 N.W.2d 919, 925 (1996) (citing *Feldman v. Green*, 138 Mich. App. 360, 369, 360

N.W.2d 881 (1984)). Importantly, "[w]here the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Id.* (citing *Michigan Podiatric Medical Ass'n v. Nat'l Foot Care Program, Inc.*, 175 Mich. App. 723, 736, 438 N.W.2d 349 (1989)).

Here, Plaintiff's remaining claims fail on two separate grounds: Plaintiff does not adequately allege either (1) the existence of valid business relationships or expectancies by Mayfield, or (2) improper motive or interference by Defendants. First, the First Amended Complaint contains only speculation about future business relationships that were desired, but not acquired, by Mayfield. Plaintiff alleges, for example, that various football teams—including teams at Georgetown University and various Michigan and Wisconsin high schools—declined to purchase S.A.F.E.Clips for fear that the product would void the helmets' warranties. *See* ECF No. 61, PageID.1404-05. But to satisfy the element of a "valid business expectancy" under Michigan law, a plaintiff "must show that they had more than a 'subjective expectation of entering into a [business] relationship.'" *Saab Auto. AB v. Gen. Motors Co.*, 953 F. Supp. 2d 782, 789 (E.D. Mich. 2013) (Drain, J.), *aff'd*, 770 F.3d 436 (6th Cir. 2014). As in *Saab*, Plaintiff presents no facts "that indicate that any of the various agreements were close to or in the process of being negotiated or approved." *Id.* Plaintiff thus fails to meet its initial burden in the tortious interference analysis.

Additionally, even accepting Plaintiff's factual allegations as true, Mayfield does not establish how any of the Defendants acted intentionally to harm Plaintiff in a manner not "motivated by legitimate business reasons." *Id.*; *see also Badiee v. Brighton Area Sch.*, 265 Mich. App. 343, 365-66, 695 N.W.2d 521 (2005). Mayfield "must allege that the interferer did something illegal, unethical or fraudulent," and it has not done so here. *Dalley v. Dykema Gossett,* 287 Mich. App. 296, 324, 788 N.W.2d 679, 696 (2010).   To the contrary, Defendants have emphasized their prioritization of safety and credibility in the helmet manufacturing space.   *See* ECF No. 62, PageID.1599.   Plaintiff's First Amended Complaint contains no allegations that the newest generation of the S.A.F.E.Clip met NOCSAE certification standards, was provided to Defendants, and was nevertheless rejected by the Manufacturer Defendants.   Without this critical claim, Plaintiff cannot sufficiently allege that Defendants acted either maliciously or improperly in this case.

Accordingly, Plaintiff has not met its burden to withstand a dismissal motion as to its tortious interference claims.   Counts III through VI will therefore be dismissed.

## V. CONCLUSION

For the reasons discussed herein, Defendants' Motion to Dismiss [#62] is **GRANTED**.

**IT IS SO ORDERED.**


s/Gershwin A. Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

Dated:  April 22, 2021


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
April 22, 2021, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager